OPINION OF THE COURT
John A. Milano, J.
The New York Sex Offender Registration Act (the Act) (L 1995, ch 192 [Correction Law, art 6-C, § 168 et seq.]) became effective January 21, 1996 (L 1995, ch 192, § 3). Modelled after New Jersey’s Megan’s Law, this Act requires that convicted sex offenders register with the appropriate law enforcement agencies. Based on an assessment of risk, information pertaining to this offender may be disseminated by the appropriate law enforcement agencies to the public. Pursuant to the Act, we must determine whether the defendant is "a sex offender or a sexually violent predator” (Correction Law § 168-n [1]) and must also determine "the level of notification” (§ 168-n [2]). These determinations are to be strongly based on the recommendations made by the Board of Examiners of Sex Offenders. To this end, the Board has promulgated a "Risk Assessment Instrument”, which is to be utilized by the courts, "to assess the risk of a repeat offense by such sex offender and the threat posed to the public safety” (§ 168-Z [5]).
The Risk Assessment Instrument assigns a numerical value to various factors, resulting in a "total risk factor score”. Based on this score the offender is then categorized into one of three levels of notification. A level one designation (0 to +70) is assigned where the risk of repeat offense is low. This level requires that the appropriate law enforcement agencies are notified pursuant to the Act. (Correction Law § 168-l [6] [a].) A level two designation (+71 to +109) is assigned where the risk of repeat offense is moderate. At this level the appropriate law enforcement agencies "may disseminate relevant information which may include approximate address based on sex offender’s zip code, a photograph of the offender, background information including the offender’s crime of conviction, modus of operation, type of victim targeted and the description of special conditions imposed on the offender to any entity with vulnerable populations.” (Correction Law § 168-Z [6] [b].) Furthermore, "[a]ny entity receiving information on a sex offender may disclose or further disseminate such information at their discretion.” (Correction Law § 168-Z [6] [b].) A level three designation *573 ( + 110 to +300) is assigned where the risk of repeat offense is high. At this level the sex offender is deemed a " 'sexually violent predator.’ ” (Correction Law § 168-Z [6] [c].) In addition to all the requirements of a level two assignment, a level three sex offender’s exact address may be disseminated. Furthermore, all of the pertinent information regarding the offender will be made available to the public through a subdirectory. (Correction Law § 168-Z [6] [c].)
This instrument is not the sole criterion utilized by the sentencing court in making its determination. In addition, the sentencing court shall also "review any victim’s statement and any materials submitted by the sex offender. The court shall also allow the sex offender to appear and be heard” (Correction Law § 168-n [3]). Furthermore, it is clearly stated in the Risk Assessment Guidelines and Commentary that the risk factor calculated under the Risk Assessment Instrument is merely presumptive. "The court may depart from it, up or down, if 'special circumstances’ warrant such a departure. 'The ability to depart is premised on a recognition that an objective instrument, no matter how well designed, will not fully capture the nuances of every case;’ a court is therefore permitted to bring its sound judgment and expertise to bear on an otherwise coldly objective exercise which seeks to quantify that which may prove to be highly subjective. (Sex Offender Registration Act, Risk Assessment Guidelines & Commentary, Jan. 1996, at 4.)” (People v Lombardo, 167 Misc 2d 942, 944.) However, in People v Ross (169 Misc 2d 308, 312 [Sup Ct, NY County 1996]), the court ruled that, because the hearing was an "administrative function”, it should "review the Board’s recommendations only for arbitrariness and capriciousness and otherwise uphold them”.
The first question for determination is whether the circumstances that are present in this case warrant the court’s departure from the guidelines established by the Board of Examiners as set forth in the Risk Assessment Instrument. In People v Lombardo (167 Misc 2d 942, supra), the court found it within its discretion to raise the defendant’s category of notification from level one to level two where the defendant had "engaged in sexual misconduct on two separate occasions with two different individuals (children, aged five and seven years respectively) over a period of several months.” (Supra, at 944.) Although the court concluded that this conduct was not encompassed by factor four of the Risk Assessment Instrument, it found that in light of the "totality of the circum *574 stances” (at 945) it could exercise its discretion and raise the risk level classification. The court specifically noted that the offender had "engaged in sexual misconduct on two separate occasions, with two different (but both very young) victims, over a period of several months.” (Supra, at 945.)
In the case at bar, the offender, a native of Turkey, is scheduled to be conditionally released to parole supervision on May 1, 1997. Said offender had been in this country for less than a year prior to his arrest for two separate sexual assaults. No information is available on the defendant’s criminal history prior to entering this country. Application of the Risk Assessment Instrument resulted in a total risk factor score of 85, which would place the defendant in category two. However, based on the commission of two sexual assaults after having only been in the country for one year, and the Board’s inability to ascertain the defendant’s prior criminal history, the Board deemed it appropriate to enhance defendant’s level of notification to level three.
Pursuant to the Act, this court held a hearing where defendant appeared and was heard. Defendant was informed of his right to have counsel appointed, but declined. (Correction Law § 168-n [3].) At this hearing, defendant acknowledged that he had used force in committing the crimes for which he stood accused, and affirmed that he had participated in an introductory sex offender program. (Prior to this hearing, defendant had refused to accept responsibility, with the resultant consequence of his total risk factor score being increased by 10 points.) The People argued for enhancement of defendant’s risk level to three, based on the same factors cited by the Board of Examiners. In addition, the People found the details surrounding the crimes necessitated a level three assessment, specifically the fact that during the course of the second sexual assault the defendant "inserted his penis into the victim’s vagina then into her anus.”
After careful consideration, we deem enhancement of defendant’s risk level from two to three to be unjustified. The Risk Assessment Instrument adequately accounts for the number of victims in factor three. Furthermore, to find enhancement of risk level appropriate based solely on the Board’s inability to ascertain information about defendant’s prior history would violate the Due Process Clause of the Fourteenth Amendment (§ 1) of the US Constitution. Also without merit is the People’s contention that the details surrounding the defendant’s second offense warrant a higher risk *575 level. "Deviate intercourse” is clearly encompassed in factor two of the risk assessment instrument, and defendant was assessed 25 points based on this factor. It is also important to note that defendant’s prior refusals to accept responsibility for his actions accounted for 10 additional points on the assessment instrument, however, at the time of the hearing defendant had accepted responsibility for the offenses he committed. For the above reasons, this court deems the Board of Examiner’s recommendation of a level three risk level to be "arbitrar[y] and capricious [ ].” (People v Ross, supra, at 312.)
Next, we address the issue of whether the constitutional proscription of ex post facto laws prohibits retroactive application of the Act. The US Constitution prohibits the passage of ex post facto laws by State governments. (US Const, art I, § 10.) Under the Ex Post Facto Clause, a retrospective increase in punishment for a crime is invalid legislation. In the case at bar, the commission of defendant’s crime occurred prior to the enactment of the Act. Therefore, the essential question before us is whether the provisions of the Act constitute punishment. If it does, than retroactive application of the Act would violate the Ex Post Facto Clause.
Numerous courts have grappled with this question. The United States District Court for the Southern District of New York addressed this issue in Doe v Pataki (940 F Supp 603), which held that the Ex Post Facto Clause precluded retroactive application of the Act’s public notification and disclosure provisions, but not of its registration provisions. Currently pending appeal, this case has an immediate impact on the present proceedings. If the Pataki decision is not reversed on appeal, then it would enjoin "certain members of the Executive Branch of New York State from enforcing those parts of the Act which provide for public notification, including any notification which could flow from a decision unfavorable to defendant on the instant motion.” (People v Brenner, NYLJ, Mar. 17, 1997, at 31, cols 3, 4 [Sup Ct, NY County].) Adopting an analytical approach, the District Court examined the Act as it relates to four categories: (1) intent, (2) design, (3) history, and (4) effects. (Supra, at 620.) The court analyzed the registration and notification provisions separately, and found that only the notification portion of the Act constituted punishment and violated the Ex Post Facto Clause.
The Pataki court examined both the subjective and objective intent of the Legislature in enacting the law and determined that the legislative intent was punitive in nature. Although *576 the preamble asserted a regulatory purpose, examination of the debate minutes of the New York Assembly revealed a punitive intent on the part of the Legislature.
As to the design of the statute, the court observed that the Act contained "classic indicia of a punitive scheme.” (Supra, at 623.) The court specifically noted that "it is excessive in its sweep * * * permits some public disclosure for all registrants, including those at the lowest risk level; [and] the Act permits broad and virtually uncontrolled disclosure.” (Supra, at 624.) The court concluded that "[t]he Act is designed in such a fashion as to suggest that it is punitive.” (Supra, at 623.)
Next, the District Court considered "whether measures similar to community notification have historically been considered punitive.” (Supra, at 624 [emphasis supplied].) The court found that the Act both stigmatizes the offender and effectively banishes him from the community. Both stigmatization and banishment were found by the court to have historically been considered punitive.
The District Court found the strongest support for the argument that the Act’s notification requirements were primarily punitive, in the dramatic effects resulting from imposition of the statute on a sex offender. The court utilized a three-prong analysis to determine whether the effects of the Act were punitive: "(i) whether the Act imposes an affirmative disability or restraint on registrants, (ii) whether the Act increases punishment by interfering with the ability of sex offenders to rehabilitate, and (iii) whether the Act serves the goals of punishment.” (Supra, at 626-627.)
As to "whether the Act imposes an affirmative disability or restraint on registrants,” the court found that "[p]ublic notification has led to an 'affirmative disability or restraint’ on registrants and their families and, indeed, to excessively harsh results.” (Supra, at 627.) The court noted that, " 'the consequences of [community notification] are unlimited. Notification is an affirmative placement by the State of a form of public stigma on [the sex offender], and this stigma by its very nature pervades into every aspect of an offender’s life.’ ” (Supra, at 627, quoting Roe v Office of Adult Probation, 938 F Supp 1080, 1091.)
The court also found that the Act had a profound effect on the ability of the sex offender to rehabilitate. "Public notification * * * prevents sex offenders from finding a home, getting a job, and reintegrating into society.” (Supra, at 628.) The court concluded that "[b]y impeding rehabilitation, public notifica *577 tion 'substantially interfere^] with the objectives of the original punishment, including the eventual rehabilitation of the offender.’ ” (Supra, at 627, quoting Nitz v Otte, US Dist Ct, D Ala, No. A95-486 CI, Jan. 24, 1996, at 13.)
Finally, the court found that "[t]he notification provisions of the Act have the effect of promoting three of the traditional goals of punishment: deterrence, retribution, and incapacitation.” (Supra, at 629.)
In a compelling summation, the District Court stated that: "[b]ecause of the current climate of fear and anger, because convicted sex offenders as a group have been deemed undeserving of any rights, the New York legislature has passed a law that increases punishment after the fact and that 'sweep[s] away settled expectations suddenly and without individualized consideration.’ ” (Supra, at 629, quoting Landgraf v USI Film-Prods., 511 US 244, 266.)
This issue was subsequently raised in People v Brenner (NYLJ, Mar. 17, 1997, at 31, col 3 [Sup Ct, NY County], supra). The Brenner court cited the same factors as Pataki (supra) in its determination as to whether the provisions of the Act constituted punishment; however Brenner analyzed these factors as they applied to the defendant in their case. The court stated that: "while the constitutionality of a statute is a question of law, determination of an ex post facto claim concerning retroactive notification can be case-specific, as measured by the facts at bar.” (Supra, at 32, col 2.) The court then found that the "defendant failed to demonstrate that the effects of any form of community notification, should it be authorized, would be appreciably beyond those which arose without such notification.” (Supra, at 32, col 4.) Based on further analysis of the intent, design and history, the court concluded that the notification provisions did not constitute punishment when applied to that defendant.
We are not persuaded by the arguments set forth in the Brenner decision (supra). The Brenner court’s analysis of the potential adverse effects the statute would have on the defendant failed to recognize that the defendant’s circumstances could change. If the defendant were to change his residence, the registration and notification provisions of the Act would follow him to his new home. Furthermore, while the adverse effects the defendant had experienced prior to the statute’s implication may fade with time, the statute’s provisions will have effect for the next decade.
The constitutionality of the prospective application of the Act is well established. (See, People v Cook, NYLJ, Nov. 22, *578 1996, at 31, col 2 [Sup Ct, NY County].) However,, we find the cogent arguments set forth by the Pataki decision (supra) to be persuasive as it pertains to the question of whether the "notification provisions” of the Act constitute punishment and are therefore a violation of the Ex Post Facto Clause when retroactively applied. Nevertheless, these ex post facto implications are an issue of Federal constitutional law, and as this question is presently pending before a Federal Circuit Court of Appeals, this court believes it appropriate to defer this issue to the Federal appellate bench.
Accordingly, at this time, the court determines that a risk level two designation is appropriate.