OPINION OF THE COURT
Geokge B. Daniels, J.
Yusef Salaam has been released from prison after serving two consecutive sentences of 31/3 to 10 years following his conviction by jury trial for rape and robbery in connection with what is now commonly referred to as the "Central Park Jogger Case”. At the age of 15, Yusef Salaam was convicted of being one of a large group of youths who, on the night of April 19,1989, committed a series of violent assaults in Central Park, including a brutal gang rape of a female jogger. He is now back before the court for a determination of what level of notification to the public and law enforcement agencies is required pursuant to the Sex Offender Registration Act (Correction Law art 6-C). Yusef Salaam is presently challenging a recommendation to the court by the Board of Examiners of Sex Offenders that he be assessed a risk level three, which requires the highest level of notification. The Board’s recommendation of a level three designation was based on the application of its established guidelines that since Yusef Salaam *728 and his rape accomplices inflicted serious physical injury on the victim, that overriding factor automatically results in a presumptive risk assessment of level three.
In addition to his numerous written submissions, six witnesses testified on behalf of Yusef Salaam. The first witness was the imam of the mosque that he now regularly attends. The imam testified that while in prison, Yusef Salaam participated in a nonreligious sex offender counseling program, and graduated from two modules of a religious-based Islamic therapeutic program relating to violent behavior awareness and substance abuse awareness. A Roman Catholic priest, who is employed full time with the Department of Correction, testified that he has known Yusef Salaam since he was 14 years old, and knows his mother to be an active member of her community. Although the witness knew that Yusef Salaam had a high rate of truancy, and was suspended from school for possessing a knife, the priest described him as a "typical, normal kid” who exhibited no signs for potential trouble prior to his arrest.
A writer, counselor and workshop facilitator testified she met Yusef Salaam when he was released on bail after his arrest in 1989, and formed a group to support the mothers of those arrested and charged. She testified that he works in construction, lives with his mother, and adheres to all the conditions of his parole. An attorney, who volunteered in the Big Brothers/Big Sisters Program, testified that he acted as Yusef Salaam’s Big Brother when Yusef Salaam was about 10 years old. He testified that Yusef Salaam received his GED high school diploma and a community college associate’s degree while incarcerated. He has been admitted to college and plans to enroll and obtain his bachelor’s degree. A retired Family Court Probation Officer, who met Yusef Salaam after his release from prison, testified that he has an extensive support system which includes his mother, the witnesses who testified at the hearing, and members of the community.
A psychiatrist, whose written report was submitted to the court, testified regarding his psychiatric evaluation of Yusef Salaam. Prior to Yusef Salaam’s incarceration, he met with him for three informal psychotherapy sessions to discuss the possibility of his imprisonment. The psychiatrist recently conducted a l1/2-to-2-hour interview and mental status examination. The doctor also interviewed various members of Yusef Salaam’s community and his prison environment. His prison youth division counselor who ran the sex offender unit *729 described Yusef Salaam to the psychiatrist as a religiously devout individual who obeyed all the rules and attended all the prescribed programs and treatments despite consistently maintaining his innocence. The psychiatrist found that Yusef Salaam has a larger support network than the average person, consisting of his family, the religious community, and the general community. He also determined that Yusef Salaam has never been drug or alcohol dependent. The doctor testified, as well as noted in his written report, that Yusef Salaam "has consistently maintained his innocence.” The doctor stated, however, that he evaluated Yusef Salaam "as if he had done it, as if he were guilty of the crime, and evaluated him as [he] would any other person who was considered to be guilty.” His personal opinion is that Yusef Salaam is innocent. The doctor’s professional opinion is that the risk of Yusef Salaam committing a violent or sexual crime is minimal to nonexistent.
ANALYSIS
The Sex Offender Registration Act embodies this State’s version of "Megan’s Law”. There are three designated risk levels: low risk (level one), moderate risk (level two), and high risk (level three) where the offender is deemed to be a "sexually violent predator” (see, Correction Law § 168-l [6] [a]-[c]). Pursuant to the Act, the Board is required to develop guidelines and procedures to assess the risk of a repeat offense by a sex offender and the threat posed to the public safety based upon, but not limited to, certain factors set forth by the Legislature (see, Correction Law § 168-l [5]). In response, the Board developed guidelines with the assistance of a group of experts with diverse experience in dealing with sex offenders (see, Sex Offender Registration Act: Risk Assessment Guidelines and Commentary [1996 ed]).
The Board created an objective risk assessment instrument to be utilized in arriving at an offender’s presumptive risk level (see, Guidelines, op. cit., at 3). The instrument considers 15 risk factors in four areas. The seven "current offense” factors are: use of violence; sexual contact with victim; number of victims; duration of offense conduct with victim; age of victim; other victim characteristics; and relationship between offender and victim. The four "criminal history” factors are: age at first sex crime; number and nature of prior crimes; recency of prior felony or sex crime; and drug or alcohol abuse. The two "post-offense behavior” factors are acceptance of responsibility and conduct while confined or under supervision. The two "release *730 environment” factors are supervision and living or employment situation.
The risk assessment instrument assigns a numerical value to the existence of certain circumstances regarding each specified factor. These values are totaled to arrive at the offender’s presumptive risk level. Where the total score is 70 points or less, the offender is presumptively level one; more than 70 points but less than 110 points, he is presumptively level two; and if 110 points or more, he is presumptively level three (see, Guidelines, op. cit., at 3). The Board’s guidelines also set forth four overrides that automatically result in a presumptive risk level three irrespective of the aggregate score of the risk factors. They are: (1) a prior felony conviction or adjudication for a sex crime; (2) the infliction of serious physical injury or the causing of death; (3) a recent threat to reoffend by committing a sexual or violent crime; or (4) a clinical assessment that the offender has a psychological, physical or organic abnormality that decreases his ability to control impulsive sexual behavior (see, Guidelines, op. cit., at 3-4). The Board determined that each of these four overriding factors should automatically render the offender a presumptive risk level three because the existence of any one of these specified circumstances provides compelling evidence that an offender poses a serious risk to public safety (see, Guidelines, op. cit., at 4).
Where a convicted sex offender receives a sentence other than a period of incarceration, the court should immediately determine the risk level by applying the Risk Assessment Guidelines (see, Correction Law § 168-d). Prior to the release of an incarcerated sex offender, a member of the Board calculates the presumptive risk level, and the Board recommends one of the three risk levels to the original sentencing court (see, Correction Law § 168-Z [6]). After receiving a recommendation from the Board, it is then the responsibility of the sentencing court to make a judicial determination of the appropriate risk level to be designated to the sex offender (see, Correction Law § 168-n). In making the risk level determination, the court shall review any victim’s statement and any materials submitted by the sex offender. The court shall allow the sex offender to appear and be heard, and inform him of his right to have counsel appointed, if necessary (see, Correction Law § 168-d [3]; § 168-n [3]). The risk assessment hearing and determination is not criminal in nature, although it does arise out of a criminal action (see, Doe v Pataki, 120 F3d 1263 [2d Cir 1997]; People v Brasier, 169 Misc 2d 337, 339 [Sup Ct, Bronx County 1996]). *731 The proceeding is a summary fact-finding hearing where the parties may present witnesses and offer evidence (see, e.g., People v Recor, 209 AD2d 831 [3d Dept 1994], affd 87 NY2d 933 [1996]; People v Tyrrell, 101 AD2d 946 [3d Dept 1984]). Such testimony and other evidence must be relevant to the issues of the offender’s likelihood to reoffend and the threat to public safety. The sentencing court has wide discretion with regard to the conduct of the hearing and the type and nature of the testimony and evidence to be considered. Formal rules of evidence are inapplicable to this type of proceeding and reliable hearsay evidence may be utilized to support the court’s final determination (see, e.g., People ex rel. Wohlford v Warden, 184 AD2d 232 [1st Dept 1992]). The risk assessment hearing is not intended to be used as a means to relitigate the guilt or innocence of the convicted sex offender.
Where the risk level determination is based solely on the presumptive risk level as calculated by the risk assessment instrument, there must be sufficient proof of the existence of the factors or override relied upon to arrive at the presumptive risk level. Additionally, where points are assessed for individual risk factors, as opposed to reliance upon a single override, the total point score must also be correctly aggregated and must fall within the specified numerical parameters set forth for that particular presumptive risk level.
The Guidelines themselves specifically provide that points should not be assessed for a factor "unless there is clear and convincing evidence of the existence of that factor” (Guidelines, op. cit., at 5). Although this is a high burden of proof, the Court of Appeals has recognized the need for this higher standard in exceptional civil matters (see, Matter of Storar, 52 NY2d 363, 379 [1981]). Clear and convincing evidence is required where the interests at stake are deemed to be more substantial than the mere loss of money, there is a need to protect particularly important individual interests, or it might result in the stigmatization of an individual (see, Addington v Texas, 441 US 418 [1979]; Santosky v Kramer, 455 US 745, 756 [1982]; Matter of Storar, supra).
Given the significant interests of both the offender and the State, the higher evidentiary burden is warranted. The Third Circuit Court of Appeals has already applied the clear and convincing evidence standard to the risk assessment determination under New Jersey’s Megan’s Law (see, E.B. v Verni *732 ero, 119 F3d 1077 [3d Cir 1997]).[1] This is the appropriate standard of proof consistent with due process and the explicit intent of the Risk Assessment Guidelines. Therefore, to sustain a presumptive risk level determination, the standard of proof to be utilized by the court is clear and convincing evidence of the existence of the factors or override relied upon.
The Board found Yusef Salaam to be a presumptive risk level three based on the existence of the override that serious physical injury was inflicted on the victim. Yusef Salaam does not dispute the Board’s findings that the victim suffered serious physical injury. Moreover, a jury found that Yusef Salaam and his accomplices committed a violent assault and brutal rape. In calculating an offender’s presumptive risk level, the Guidelines assume that the Board and court will generally apply traditional principles of accessorial liability (see, Guidelines, op. cit., at 7). Hence, Yusef Salaam must be held criminally responsible for the serious physical injury sustained by the jogger as a result of his and his accomplices’ criminal acts. There is clear and convincing evidence of the existence of the overriding factor. Therefore, the Board properly relied upon the override that serious physical injury was inflicted upon the victim in determining that Yusef Salaam was a presumptive risk level three pursuant to the Guidelines.
The presumptive risk level calculated from either aggregating the risk factor points or by applying an override is expected to result in the proper classification in most cases. Departure from the presumptive risk level is expected to be the exception rather than the rule (see, Guidelines, op. cit., at 4). A risk level determined through the use of the Guidelines’ objective risk assessment instrument "is 'presumptive’ because the Board or court may depart from it if special circumstances warrant” (see, Guidelines, op. cit., at 4). Departures may be either upward or downward. Generally, however, the Board or the court may not depart from the presumptive risk level unless it concludes that "there exists an aggravating or mitigating factor of a kind, or to a degree, not otherwise adequately taken into account by the guidelines” (see, Guidelines, op. cit, at 4).
The first court to address the question of what is the applicable standard of proof in determining whether a departure from the presumptive risk level is warranted was in People v *733 Ross (169 Misc 2d 308 [Sup Ct, NY County 1996]). Ross held that a "court should * * * review the Board’s recommendations only for arbitrariness and capriciousness and otherwise uphold them” (supra, at 312). The court reasoned that for purposes of determining an offender’s risk level, a court is performing an administrative function. The Ross analysis relied upon legal authority concerning judicial review of administrative determinations in CPLR article 78 proceedings. This "arbitrary and capricious” standard has since been followed by other courts (see, People v Ayten, 172 Misc 2d 571 [Sup Ct, Queens County 1997] [holding that the Board’s upward departure based upon its inability to ascertain the offender’s criminal history was arbitrary and capricious]; People v Brasier, supra [after considering and weighing the classification recommended by the Board, the court held that a risk level three was not arbitrary, capricious or unreasonable]). However, courts have departed from the Board’s presumptive risk level recommendation without reference to an arbitrary and capricious standard (see, e.g., People v Lombardo, 167 Misc 2d 942 [Nassau County Ct 1996] [the court found that an upward departure was warranted since the offender had engaged in sexual misconduct on two separate occasions with two different children, even though no points could be assessed for a continuing course of sexual misconduct with the same victim]). In recently upholding the constitutionality of the Sex Offender Registration Act, the United States Court of Appeals for the Second Circuit specifically refrained from determining the propriety of applying an "arbitrary and capricious” standard in order to depart from the Board’s recommendation.[2]
This court respectfully disagrees with the Ross court that in making its final determination, the court should merely review the Board’s presumptive risk level recommendations only for arbitrariness and capriciousness and otherwise uphold them. A court’s judicial determination of an offender’s risk level is not in the nature of an article 78 proceeding. The arbitrary and capricious standard used in an article 78 proceeding is appropriate to challenge and review a final administrative deter- *734 ruination (see, CPLR 7801 [1]). The Board’s assessment of a presumptive risk level, however, is simply a recommendation to the court, not a final administrative determination (cf., Doe v Division of Probation & Correction Alternatives, 171 Misc 2d 210 [Sup Ct, Dutchess County 1997]).[3] It is the court that retains the ultimate responsibility to determine an offender’s risk level after receiving the Board’s recommendation (see, Correction Law § 168-n [2]). Before making its determination, the court must independently review and consider any victim’s statement and any materials submitted by the sex offender, as well as allow the offender to appear and be heard (see, Correction Law § 168-n [3]). To provide for the court’s consideration of such evidence, after receiving the Board’s presumptive risk level recommendation, indicates that the Legislature did not contemplate that the court would merely confirm that recommendation absent a finding of arbitrariness and capriciousness. Furthermore, such a standard for departure is not workable where the court must make its risk assessment determination based upon its own calculations at the time of conviction, without a recommendation from the Board. Nor can such a standard be used by the Board when it is determining whether its recommendation to the court will depart from the presumptive risk level. There is no rationale for applying anything but a single uniform standard in all instances where a basis for departure is considered by the Board or the court.
Given the importance of the individual and public interests involved in designating an appropriate risk level, the court has an independent responsibility to make an accurate final judicial determination. Unless the Board relies upon a risk factor or override which is inapplicable, or the Board assigns a presumptive risk level which does not comport with the aggregate risk factor points, it is difficult to imagine how its presumptive risk level recommendation could otherwise be arbitrary and capricious. The presumptive risk level is calculated in a fairly mechanical fashion. A point score is attributed to the existence of certain factors and the points are totaled, or the highest level of risk is automatically assessed based upon the existence of a single override. To avoid an inac *735 curate presumptive risk level assessment, the Guidelines specifically provide that a factor or override should not be relied upon unless there is clear and convincing evidence of the existence of that factor or override. The court would never have a basis to consider departure by merely reviewing the Board’s recommendation for arbitrariness and capriciousness, where that recommendation is solely the presumptive risk level as properly calculated through applying the risk assessment instrument. Such a standard does not allow for the consideration of "special circumstances” or "aggravating or mitigating factor[s] of a kind, or to a degree, not otherwise adequately taken into account by the guidelines.” (Guidelines, op. cit., at 4.)
Although this court finds that the arbitrary and capricious standard is inappropriate, a high evidentiary standard is still necessary in order to depart from the presumptive risk level. The presumptive risk level is a rebuttable presumption, albeit a heavy one. Some presumptions require, for reason of policy or logic, a higher degree of rebuttable evidence. A correspondingly high order of evidence is required to overcome such a heavy presumption. This high order of evidence is usually referred to as clear and convincing evidence (see, Prince, Richardson on Evidence § 3-104, at 57 [Farrell 11th ed]; Backer Mgt. Corp. v Acme Quilting Co., 46 NY2d 211, 219-220 [1978]; Abrahami v UPC Constr. Co., 224 AD2d 231, 233 [1st Dept 1996]). The Legislature made clear that this State’s policy to assist local law enforcement agencies’ efforts to protect their communities by requiring sex offenders to register and to authorize the release of necessary and relevant information about certain sex offenders to the public was of paramount importance (see, L 1995, ch 192, § 1). Additionally, since the calculated presumptive risk level is based upon factors or overrides which experts and professionals in the field have indicated are the greatest predictors of future behavior, it must be afforded great weight.
Special circumstances warranting an upward or downward departure must be based on clear and convincing evidence of the existence of an aggravating or mitigating factor of a kind, or to a degree, not otherwise taken into consideration by the Guidelines. This evidentiary standard is consistent with the expressed intent of the drafters regarding the application of the Guidelines. For example, the Guidelines provide that where an offender has admitted committing an act of sexual misconduct for which no criminal history factor points are as *736 sessed because there has been no judicial determination, it may "form the basis for an upward departure if there is clear and convincing evidence that the conduct occurred” (see, Guidelines, op. cit., at 6 [emphasis added]). The Guidelines recognize that "[c]ircumstances that may warrant a departure cannot, by their very nature, be comprehensively listed in advance. Departures may be upward (e.g., from level 1 to 2) or downward (e.g., from level 3 to 2)” (see, Guidelines, op. cit., at 4). The Guidelines themselves provide examples of possible areas of departure to be considered by the Board or the court that clearly go beyond, and are inconsistent with, a mere review by the court of the Board’s presumptive risk level calculations for arbitrariness and capriciousness.[4] The presumptive risk level as properly calculated by the objective risk assessment instrument of the Guidelines is itself a sufficient basis on which to classify a sex offender. The court, however, is required to make an individualized determination based upon a review of all pertinent factors (see, Guidelines, op. cit., at 2).[5] A clear and convincing evidence standard takes into consideration the important interests of both the offender and the State in an accurate risk assessment determination. It also gives the proper amount of deference to the expertise of those who drafted the Guidelines and devised the objective risk assessment instrument. "The ability to depart is premised on a recognition that an objective instrument, no matter how well designed, will not fully capture the nuances of every case. Not *737 to allow for departures” unless the presumptive risk level assessment is arbitrary and capricious, "would therefore deprive the Board or the court of the ability to exercise sound judgment and to apply its expertise to the offender” (see, Guidelines, op. cit., at 4).
Yusef Salaam claims that his exemplary prison record, his postoffense behavior, and his release environment are such that this court should conclude that a level three designation is unwarranted. Witnesses have described Yusef Salaam’s greater level of maturity and deep commitment to his religious beliefs since the time of the crime. The extensive community support network available to Yusef Salaam also appears to be very significant. Additionally, the fact that Yusef Salaam is pursuing his education and has made efforts to continue his employment, are certainly positive endeavors.
An exemplary prison record, however, is not a basis for a downward departure from the presumptive risk level. Although the Guidelines note that an offender’s poor adjustment while in custody is a factor indicative of future dangerous behavior, there is no suggestion that an offender’s exemplary prison record should be considered a mitigating factor (see, Guidelines, op. cit., at 15). Yusef Salaam’s home and community environment are substantially the same as when the crimes were committed. The witnesses who know him expressed the opinion that he is unlikely to commit a violent or sexual crime in the future. However, those individuals who knew him prior to the crime could not have foreseen that he would have committed the vicious crimes for which he was convicted. Although there exist favorable signs of Yusef Salaam’s rehabilitative efforts, it must also be stressed that he has only been out of prison for approximately six months. Such a short period of time, during which he appears to have taken significant steps toward a productive and law-abiding life, does not convince this court that he is a low risk or moderate risk to reoffend, or that he poses no danger to the community.[6]
An evaluation of Yusef Salaam’s expert psychiatric testimony also does not convince this court that, despite the brutal nature of the crime, departure from the presumptive risk level three assessment is warranted. The court is troubled by the psychiatrist’s personal belief that Yusef Salaam is innocent, *738 despite his conviction and the evidence on which the jury relied. The guilt of a convicted sex offender is obviously not a question at issue before the court at a risk assessment hearing. The court is hesitant to rely on the psychiatrist’s expert opinion that Yusef Salaam poses a low risk of reoffending since the court is unable to determine to what extent the doctor’s personal belief in Yusef Salaam’s innocence may have influenced his professional opinion. What is of significant concern is the absence of any acceptance of responsibility by Yusef Salaam for the brutal and violent crime for which he was convicted. This convicted sex offender has not only shown no remorse regarding the crime, he continues to deny entirely his involvement in its commission. Even Yusef Salaam’s own expert admitted that it is vital for the treatment of sex offenders to face and accept responsibility and to acknowledge their culpable actions. Where a sex offender refuses to do so, the psychiatrist recognized that the roots of what precipitated that offense are not treated. The Guidelines themselves note that an offender who does not accept responsibility for his conduct is a poor prospect for rehabilitation (see, Guidelines, op. cit., at 14). Accordingly, the psychiatrist’s professional opinion gives this court no confidence that there is no more than a low or moderate risk of a repeat offense.
Serious questions also remain regarding the effectiveness of Yusef Salaam’s participation and completion of the institution’s sex offender programs if he maintains the position that he never committed any sexually violent offense. Although an exceptional response to treatment can be a basis for a downward departure, the Board recognized in drafting the Guidelines that an offender’s participation in a treatment program, by itself, should not reduce his risk level (see, Guidelines, op. cit., at 16, 23).
There is clear and convincing evidence of the existence of the override on which the Board relied in assessing a presumptive risk level three. The nature of the violent assault and brutal gang rape which resulted in the serious physical injury inflicted upon the victim in this case provides compelling evidence that the offender poses a serious risk to public safety. It has not been established by clear and convincing evidence that there exists a mitigating factor of a kind, or to a degree, not otherwise adequately taken into account by the Guidelines which would constitute special circumstances warranting a downward departure from the presumptive risk level three as recommended by the Board. Therefore, this court finds pursu *739 ant to the Sex Offender Registration Act that the risk of repeat offense is high and there exists a threat to the public safety. Accordingly, Yusef Salaam is deemed a sexually violent predator and a risk level three designation is given to such sex offender.
[Portions of opinion omitted for purposes of publication.]

. The New Jersey guidelines were utilized in preparing the initial draft of New York’s guidelines (see, Guidelines, op. cit., Appendix, at 22), and "the New Jersey scale was the starting point for development of New York’s assessment instrument” (see, Guidelines, op. cit., at 3, n 4).

. "Although the Act is silent on the degree of deference a sentencing court must accord to the Board’s recommendation during such a hearing, • one New York court has ruled that the Board’s risk-level recommendations should be accepted by the sentencing court unless arbitrary and capricious. See People v. Ross, 169 Misc.2d 308, 312, 646 N.Y.S.2d 249, 252 (Sup.Ct.N.Y.Co.1996).” "We express no opinion on the state law issue of the degree of deference a court should give to the views of the Board” (Doe v Pataki, supra, at 1269, 1281, n 18).

. The only administrative agencies given the authority to make a final risk assessment determination are the Division of Parole and the Department of Probation who must determine the risk level "for every sex offender who on the effective date” of the Act "is then on parole or probation for [a sex] offense” (see, Correction Law § 168-g [1]). Such a final administrative determination would be subject to article 78 court review with its attendant standard of review.

. "For example, if an offender’s presumptive risk level is 3 but he suffers from a physical condition that minimizes his risk of reoffense, such as advanced age or debilitating illness, a downward departure may be warranted” (see, Guidelines, op. cit., at 4). The Board or court may choose to depart from the risk level calculated if it determines that the point score of applying accessorial liability results in an overassessment of the offender’s risk to public safety (see, Guidelines, op. cit., at 7). Where no sexual contact occurred, but it is clear that an offender intended to rape his victim and was prevented by some factor such as police intervention, "the Board or court may choose to depart upwardly if it concludes that the lack of points in this category results in an under-assessment of the offender’s actual risk to public safety” (see, Guidelines, op. cit., at 9). "An offender’s response to treatment, if exceptional, can be the basis for a downward departure” (see, Guidelines, op. cit., at 16).

. "A more careful reading of the statutue * * * supports the conclusion that the guidelines should eschew per se rules and that risk should be assessed on the basis of a review of all pertinent factors * * * Such an individualized approach is also mandated by the federal Violent Crime Control and Law Enforcement Act of 1994 * * * with which the Legislature intended the Board to comply” (Guidelines, op. cit., at 2-3). "Federal law eschews per se rules and requires a court to make an individualized determination that a person is a high risk offender” (Guidelines, op. cit., at 3, n 3).

. At any time after a risk level determination, a sex offender may petition the sentencing court to be relieved of any further duty to register. The court may grant or deny the petition for relief after receiving an updated report from the Board (see, Correction Law § 168-o).