*253 OPINION OF THE COURT
John P. Walsh, J.
The respondent, before the court for a risk level determination pursuant to the Sex Offender Registration Act (Correction Law § 168-d [3]) (hereinafter referred to as SORA), moves for an order rejecting the recommendation of the Board of Examiners of Sex Offenders (the Board) that the respondent be designated a risk level three. The respondent further seeks an order holding that he is not required to register as a sex offender. The People oppose.
On September 23, 2005, the parties appeared before the court and based on the record of that proceeding and submissions by both sides, the court makes the following findings of fact.
Findings of Fact
On November 15, 1988, the respondent was arrested in Kings County and subsequently indicted for robbery in the first degree (Penal Law § 160.15 [3]) and related offenses. On November 15, 1989, he entered a plea of guilty to attempted robbery in the first degree (Penal Law §§ 110.00, 160.15 [3]). Sentencing was scheduled for January 9, 1990, at which time the respondent failed to appear and a warrant was ordered.
Subsequent to the issuance of the Kings County warrant, the respondent was arrested in North Carolina and charged with having sexual contact with four children. On January 25, 1991, following a three-day trial, he was convicted of one count of first degree sex offense (NC Gen Stat § 14-177) and related charges and was sentenced to life in prison.
Following a second trial, he was convicted on May 23, 1991 of two counts of first degree sex offense (NC Gen Stat § 14-177) and related charges and was sentenced to two additional terms of life in prison plus 60 years.
Both convictions were based solely on testimonial evidence from the children, with no physical or medical evidence being introduced at trial.
The primary witnesses at both trials were the “victims,” namely, Curtis Moser, Louis Bennett and Joseph Doster. Each of the “victims” testified to nonconsensual penis/anal contact with the respondent. Louis Bennett testified, additionally, to observing the respondent performing anal intercourse on Todd Jahn (Todd Jahn never testified at trial due to hearing and speech disabilities. The conviction for the Jahn allegation was based *254 solely on the testimony of Louis Bennett). All of the complaining witnesses were under 12 years of age at the time of the alleged sexual contacts.
Fourteen additional witnesses testified at the trials to witnessing “rapes” or other sexual abuse, all of which witnesses were children of various ages.
The respondent maintained his innocence throughout his years in prison and 12 years later, in 2003, the North Carolina Center for Actual Innocence (the Center) attempted to locate and interview the children — now adults — who testified at his trial.
The Center managed to locate the three primary witnesses (Doster, Moser and Bennett) and 12 of the 14 additional witnesses, all of whom have recanted. The three primary witnesses have submitted affidavits in which they have admitted lying on the stand in order to convict someone whom rumors in the community had singled out as the “rapist.”[1] The Bennett affidavit further recites that his testimony in 1991 — that he observed sexual contact between the respondent and Jahn — was also fabricated. Copies of these affidavits were submitted to the court and there is no dispute as to their authenticity nor have the People contested the accuracy of their recantations.
Based on this recanted testimony and newly discovered exculpatory evidence, the respondent’s North Carolina attorneys filed a motion for appropriate relief on July 28, 2003, seeking to exonerate the respondent. During the pendency of this motion, the North Carolina Union County District Attorney offered to consent to the convictions being vacated in return for a plea to lesser charges for which the respondent would receive a “time served” sentence.
This offer was accepted by the respondent. It is undisputed that his attorneys recommended that he accept this offer. Their fear was that they had no physical evidence to establish his innocence and that if a court did not accept the recantation testimony of the 1991 witnesses, the respondent ran the risk of not prevailing on his motion and thereby would spend the rest of his life in prison.
Accordingly, on May 24, 2004, in the Superior Court Division of the North Carolina General Court of Justice, Union County, *255 the District Attorney consented to the 1991 convictions being vacated (thereby reinstating the original charges) and the respondent entered a guilty plea to attempted first degree sex offense (NC Gen Stat § 14-27.4) (relating to the complainant Doster) and two counts of indecent liberties with a minor (NC Gen Stat § 14-202.1) (relating to the complainants Jahn and Bennett) with the State dismissing the remaining charges. The respondent was then sentenced to time served and waived extradition to New York State.
It should be noted that it is the practice of the North Carolina Union County Superior Court, in accepting pleas, to not obtain a factual allocution and, indeed, there is no factual allocution by the respondent. The plea transcript consists of series of preprinted questions which relate to the voluntariness and circumstances of the plea, which questions are answered with a “yes,” “no” or “N/A” being indicated in a space set aside for such answer next to each question.[2] Presumably, a court clerk writes the answers to the questions. Question 14, which reads: “The prosecutor and your lawyer have informed the court that these are all the terms and conditions of your plea,” has the following statement written by, presumably, the court clerk: “Defendant pleads guilty to one count of attempted first degree sex offense [Doster] and 2 counts of Indecent Liberties with a Minor [Jahn and Bennett] [sic] State agrees to dismiss pending charges. Defendant will be sentenced to time served. Defendant agrees to waive extradition to New York.”
Note should be made regarding the respondent’s previous criminal history, in particular, a conviction in North Carolina on June 30, 1977, when the respondent was 16 years of age, by a plea of guilty to crime against nature (NC Gen Stat § 14-177) for which he served 18 months of a four-year sentence. Section 14-177 provided as follows: “If any person shall commit the crime against nature, with mankind or beast, he shall be guilty of a felony, and shall be fined or imprisoned in the discretion of the court.”
It is the defense contention that this charge was premised upon the respondent inserting a fishing pole into the rectum of a pony. To contest this fact, the People have submitted to the court a thesis entitled “Far From the Truth: Uncertain Justice in the Icemorlee Child Sex Abuse Cases” submitted by one Joshua D. Myerov, a graduate student in journalism at *256 the University of North Carolina at Chapel Hill, dated 2002, in which the student recites hearsay conversations with law enforcement agents who state that the respondent “was caught having sex with a horse” (at 3) and “Parker was there raping [the complainant’s] pony” (at 33).
The court finds as a matter of fact that the previous conviction was based on the facts as set forth by the respondent, as the People have not established by clear and convincing evidence anything to the contrary.
Upon arrival in New York, the warrant for the 1988 robbery indictment was vacated and that matter was resolved.
Since the respondent is now residing in New York State, the Board has submitted, pursuant to Correction Law § 168-k, a risk level instrument and case summary.
The case summary, which is part of the court record, in pertinent part, states:
“Prior to being returned to New York, he had been incarcerated in North Carolina State Prison after being convicted on a number of felony sex abuse charges . . . [He] has a prior felony sex offense conviction in North Carolina in 1977 at the age of sixteen. There are no facts currently available surrounding this conviction. He was convicted of the instant sex offense in [1991], and resentenced in 2004
The summary proceeds to set forth the details of the sex crimes for which he was convicted in 1991: that he was picked out of a photo array and that the case involved 19 reported victims. It further states:
“[In 2004] he was re-sentenced to time served after pleading guilty to two counts of Indecent Liberties with a Minor . . . and one count of Attempted Sex Offense First Degree . . . His plea covers the sexual abuse of a then twelve year old boy, a five year old male special education student and an eight year old boy.”
The risk level instrument, using the facts from the 1991 conviction (as there are no facts set forth in the 2004 plea allocution), finds that the respondent is a risk level three offender.
The Board also recommends that the respondent be designated a predicate sex offender based on the 1977 conviction.
*257 Conclusions of Law
The Sex Offender Registration Act
On January 21, 1996, SORA became effective. SORA established a notification and registration scheme for individuals convicted of certain enumerated sex offenses. Under that scheme, a convicted sex offender is classified into one of three levels based upon the risk that the offender will commit a repeat offense. (Correction Law § 168-Z [6].) If the risk of repeat offense is low, the sex offender is designated as a level one offender. For these individuals, SORA requires notification to law enforcement agencies located in the offender’s jurisdiction, and annual registration by the offender for a period of 10 years. (Correction Law §§ 168-f, 168-h, 168-Z [6] [a].) Level two classification, which is given to offenders who present a moderate risk of reoffense, also requires law enforcement notification and annual registration for 10 years. In addition, SORA allows law enforcement agencies to notify any entity with “vulnerable populations” that a convicted level two sex offender resides in the community. Those entities, in turn, may further disseminate that information at their discretion. (Correction Law §§ 168-f, 168-h, 168-Z [6] [b].) The highest designation, level three, is given to sex offenders whose risk of a repeat offense is high. Level three offenders must register in person every 90 days for a minimum of 10 years, and potentially for life.
In addition to all of the notification provisions applicable to risk level two offenders, risk level three offenders are included in a directory of sex offenders which is made available to the public. (Correction Law §§ 168-f, 168-h, 168-Z [6] [c].)
Finally, for all three classification levels, SORA requires that information about the offender be available to any member of the public who calls a designated “900” telephone number. (Correction Law § 168-p.)
Pursuant to SORA, the Board has developed guidelines to assess the risk of a repeat offense by a sex offender and the threat that person posed to the public safety. (See Correction Law § 168-Z [5].)
The Role of the Court
The Board consists of five members who are employees of the executive branch of government (three from the Division of Parole and two from the State Department of Correctional Services) appointed by the Governor (Correction Law § 168-Z [1]). It is one of the responsibilities of the Board, applying factors which the Board has adopted (Correction Law § 168-Z [5]), to
*258 “make a recommendation ... to the sentencing court as to whether such sex offender warrants the designation of . . . predicate sex offender ... In addition, the guidelines shall be applied by the board to make a recommendation to the sentencing court . . . providing for one of the . . . three levels of notification” (see Correction Law § 168-Z [6]).
With regard to designating an offender a “predicate sex offender,” the statutory language clearly places the Board in the position of recommending such designation and the court determining whether the recommendation warrants the designation. If the court determines that an offender is not a “predicate sex offender,” the Board’s recommendation may be ignored.
With respect to determination of risk level, the People contend that the court must apply the risk level guidelines to determine the level of notification, with the People arguing that the Board’s recommendation of risk level three is appropriate.
Inherent in this contention is that the court, in determining risk level, must operate within one of the three risk levels set forth in the statute. This would fly in the face of the clear statutory language of Correction Law § 168-Z (6) and, additionally, usurp the role of a court in reviewing any administrative agency action.
It is certainly within the power of the Legislature to preclude judicial review of agency action (see Matter of Guardian Life Ins. Co. of Am. v Bohlinger, 308 NY 174 [1954]) and the Legislature has, on rare cases, taken such action (see Civil Service Law § 76; Matter of New York City Dept. of Envtl. Protection v New York City Civ. Serv. Commn., 78 NY2d 318 [1991]). In the absence of a clear legislative intent, however, such preclusion will not be found (see Matter of Dairylea Coop. v Walkley, 38 NY2d 6 [1975]; Matter of New York City Dept. of Envtl. Protection v New York City Civ. Serv. Commn., supra; Abbott Laboratories v Gardner, 387 US 136 [1967]). No such “clear” legislative intent is present in Correction Law § 168-Z (6).
The role of the Board is, therefore, to recommend. It is within the power of the court to make a determination based on that recommendation (see People v Stevens, 91 NY2d 270 [1998]; Matter of Nadel, 188 Misc 2d 427 [2001]).
The sentencing court is to use the same factors as the Board in making its determination. (See Stevens, supra; People v Jimenez, 178 Misc 2d 319 [Sup Ct, Kings County 1998]; People v Ay- *259 ten, 172 Misc 2d 571 [Sup Ct, Queens County 1997].) However, the ability of the sentencing court to depart from the recommendation is
“premised on a recognition that an objective instrument, no matter how well designed, will not fully capture the nuances of every case ... Of course, . . . [t]he expectation is that the instrument will result in the proper classification in most cases so that departures will be the exception not the rule . . . [Therefore,] the . . . court may not depart from the presumptive risk level unless it concludes that there exists an aggravating or mitigating factor of a kind, or to a degree, not otherwise adequately taken into account by the guidelines.” (Board of Examiners of Sex Offenders, Sex Offender Registration Act: Risk Assessment Guidelines and Commentary at 4 [Nov. 1997] [hereinafter Guidelines]; see also Matter of Vandover v Czajka, 276 AD2d 945 [3d Dept 2000]; Matter of O’Brien v State of N.Y. Div. of Probation & Correctional Servs., 263 AD2d 804, 805-806 [3d Dept 1999], lv denied 94 NY2d 758 [1999]; Matter of New York State Bd. of Examiners of Sex Offenders v Ransom, 249 AD2d 891, 891-892 [4th Dept 1998] [“The court . . . may depart from that recommendation and determine the sex offender’s risk level based upon the facts and circumstances that appear in the record. The Board, therefore, serves only in an advisory capacity that is similar to the role served by a probation department in submitting a sentencing recommendation”]; Jimenez, supra at 322-323 [“(T)he Legislature did not intend to place upon the criminal courts of this State a burden to act merely as a regulatory body to confirm the determination of the Board . . . (T)he court must make a de novo determination, giving due consideration to the recommendation of the Board”].)
If either the People or the sex offender disagrees with the Board’s recommendation in the sentencing court, the parties shall be afforded a hearing. (See Correction Law § 168-n [3].) In such a hearing,
“[t]he sentencing court has wide discretion with regard to the conduct of the hearing and the type and nature of the testimony and evidence to be considered. Formal rules of evidence are inapplicable to this type of proceeding and reliable hearsay *260 evidence may be utilized to support the court’s final determination.” (People v Salaam, 174 Misc 2d 726, 731 [Sup Ct, NY County 1997]; see also People ex rel. Wohlford v Warden of House of Detention for Men, Rikers Is. Correctional Facility, 184 AD2d 232 [1st Dept 1992]; People v Brasier, 169 Misc 2d 337, 339-340 [Sup Ct, Bronx County 1996] [“(T)he hearing contemplated by this statute does not litigate guilt or nonguilt but: ‘is a summary proceeding which does not trigger strict evidentiary rules or all the procedural safeguards available to a defendant in a criminal action’ . . . The situation herein is more akin to (a) forfeiture (proceeding)”], quoting People v Recor, 209 AD2d 831, 831 [3d Dept 1994], affd 87 NY2d 933 [1996].)
At the hearing, the People bear the burden of proving the facts supporting the determination sought by clear and convincing evidence and
“[i]n making the determinations the court shall review any victim’s statement and any relevant materials and evidence submitted by the sex offender and the district attorney and the recommendation and any materials submitted by the board, and may consider reliable hearsay evidence submitted by either party, provided that it is relevant to the determinations. Facts previously proven at trial or elicited at the time of entry of a plea of guilty shall be deemed established by clear and convincing evidence and shall not be relitigated.” (Correction Law § 168-n [3]; see also People v David W., 95 NY2d 130 [2000]; Stevens, supra; Guidelines at 5.)
Since the 1991 convictions in this case were vacated with the consent of the North Carolina prosecutor and no facts were adduced at the entry of the plea in 2004, there is a need for the People to shoulder the burden of establishing the facts to support the Board’s recommendation by clear and convincing evidence. The facts cannot be deemed as established.
Designation as Predicate Sexual Offender
A person is a predicate sex offender if he or she has been convicted of an offense set forth in Correction Law § 168-a (2) *261 or (3)[3] and has been previously convicted at any time of any such offenses. (Correction Law § 168-a [7] [c].) The predicate offense in this case is the 1977 conviction of crime against nature (NC Gen Stat § 14-177).
In order for an out-of-state conviction to qualify as a “predicate offense,” it must include all of the essential elements of a comparable New York sex offense or a felony in the other jurisdiction for which the offender is required to register in such jurisdiction (see Correction Law § 168-a [2] [d] [i], [ii]).
A review of the North Carolina Sex Offender Registration Act discloses that there is no requirement to register for convictions of crime against nature (NC Gen Stat § 14-177; see Sex Offender and Public Protection Registration Programs, NC Gen Stat, ch 14, subch VII, art 27A.)
As previously noted, crime against nature (NC Gen Stat § 14-177) provided as follows: “If. any person shall commit the crime against nature, with mankind or beast, he shall be guilty of a felony, and shall be fined or imprisoned in the discretion of the court.”
This statute has been, over the years, applied to cover conduct constituting anal and oral sexual conduct and sexual conduct with animals. (See State v Poe, 40 NC App 385, 252 SE2d 843 [1979], appeal dismissed 298 NC 303, 259 SE2d 304 [1979], appeal dismissed 445 US 947 [1980] [oral human conduct]; State v Pope, 168 NC App 592, 608 SE2d 114 [2005], review denied 612 SE2d 636 [NC 2005] [crime against nature is sexual intercourse contrary to the order of nature, and it includes acts with animals and acts between humans per anum and per os].) Since the underlying facts of this prior conviction relate to the insertion of a foreign object into the rectum of an animal, the closest analogy to a New York sex crime listed in Correction Law § 168-a (2) is sexual misconduct (Penal Law § 130.20 [3]), which, in pertinent part, provides that a “person is guilty of sexual misconduct when: . . . (h)e or she engages in sexual conduct with an animal.” “ ‘Sexual conduct’ means sexual intercourse, oral sexual conduct, anal sexual conduct, aggravated sexual contact, or sexual contact” (Penal Law § 130.00 [10]); “aggravated sexual contact” relates to sexual contacts with children (Penal Law § 130.00 [11]) and “ ‘sexual contact’ means *262 any touching of the sexual or other intimate parts of a person not married to the actor” (Penal Law § 130.00 [3] [emphasis supplied]).
Accordingly, the North Carolina conviction in 1977 for crime against nature as it relates to this respondent does not qualify as a “predicate offense” since it does not include all of the essential elements of a comparable New York sex offense.
The court determines that the respondent is not a predicate sex offender.
Duty to Register and Risk Level
One can only believe that the Board did not have access to the information that has been presented to this court, namely, the affidavits of the “victims” who testified at the 1991 proceedings and who are the complainants upon which the 2004 pleas were entered. Taking into consideration the recantations by the complaining witnesses together with the recantations of the 12 additional witnesses who testified at both trials in 1991, the lack of any factual allocution at the 2004 plea proceeding, and finally, the circumstances under which that plea was taken, this court finds that there is no clear and convincing evidence that the respondent committed any sex offense warranting registration pursuant to SORA. This determination is reached with the court being mindful that in this state, ordinarily, recantation evidence is “inherently unreliable and is insufficient alone to require setting aside a conviction” (People v Brown, 126 AD2d 898, 900 [3d Dept 1987], lv denied 70 NY2d 703 [1987]; People v Stamps, 268 AD2d 886 [3d Dept 2000]; People v Cintron, 306 AD2d 151, 152 [1st Dept 2003], citing People v Shilitano, 218 NY 161 [1916]). What takes this “recantation” evidence out of the realm of “inherent unreliability” is the North Carolina prosecutor agreeing to vacate convictions which resulted in two life term plus 60-year sentences and allowing the respondent to be at liberty with a “time served” sentence.
Accordingly, it is ordered that the respondent not be required to register as a sex offender.
Appendix A
“1. Are you able to hear and understand me?
“2. Do you understand that you have the right to remain silent and that any statement you make may be used against you?
“3. At what grade can you read and write?
*263 “4. a) Are you now under the influence of alcohol, drugs, narcotics, medicines, pills or any other intoxicants? b) When was the last time you used or consumed any such substance?
“5. Have the charges been explained to you by your lawyer, and do you understand the nature of the charges, and you understand every element of each charge?
“6. a) Have you and your lawyer discussed the possible defenses, if any, to the charges? b) Are you satisfied with your lawyer’s legal services?
“7. a) Do you understand that you have the right to plead not guilty and be tried by a jury? b) Do you understand that at such trial you have the right to confront and cross examine witnesses against you? c) Do you understand that by your plea(s) you give up these and your other constitutional rights relating to a trial by jury?
“[8 and 9 are marked not applicable]
“10. Do you understand that you are pleading guilty to the charges shown on the attached sheet which carry the total punishments listed?
“11. Do you personally plead guilty?
“12. Are you in fact guilty?
“13. Have you agreed to plead as part of a plea arrangement? Before you answer, I advise you that the Courts have approved plea negotiating, and if there is such, you may advise me truthfully without fear of incurring my disapproval?
“14. The prosecutor and your lawyer have informed the court that these are all the terms and conditions of your plea: a) Is this correct as being your full plea arrangement? b) Do you personally accept this arrangement?
“15. (Other than the plea arrangement between you and the prosecutor) has anyone made any promises or threatened you in any way to cause you to enter this plea against your wishes?
“16. Do you enter this plea of your own free will?
“17. Do you have any questions about what has just been said to you or about anything else connected to your case?”
*264 The respondent answered “YES” to all of the above questions except for question No. 3, to which he answered “10th,” No. 4 (b), to which he answered “Today Blood Pressure Medicine” and Nos. 4 (a) and 15, to which he answered “NO.”
There is an attached document to the above questionnaire which lists the names and section numbers of the crimes to which the respondent pleaded guilty as well as file numbers, category and maximum punishment.

. Further investigation by the Center uncovered significant exculpatory evidence pointing to other individuals as the perpetrator, which information was not disclosed by the North Carolina prosecutors pursuant to their Brady obligations (see Brady v Maryland, 373 US 83 [1963]).

. The questions and respondent’s answers are set forth in Appendix A.

. Correction Law § 168-a (3) relates to sexually violent offenses. It has not been contended, nor could it be, that the 1977 conviction falls within the category of a sexually violent offense.