**John DOE, Richard Roe, and Samuel Poe, individually and on behalf of all other persons similarly situated, Plaintiffs,**

v.

**Hon. George E. PATAKI, in his official capacity as Governor of the State of New York, et al., Defendants.**

No. 96 CIV. 1657(DC).

United States District Court, S.D. New York.

May 7, 1998.

Thomas M. O'Brien, Susan L. Hendricks, Laura R. Johnson, The Legal Aid Society, Criminal Defense Division, Special Litigation Unit, New York City, for Plaintiffs.

Dennis C. Vacco, Attorney General of the State of New York by Christine E. Morrison, Assistant Attorney General, New York City, for Defendants.

## OPINION

CHIN, District Judge.

In this case, plaintiffs continue their challenge to the constitutionality of the New York State Sex Offender Registration Act, N.Y. Correction Law §§ 168 to 168–*v* (McKinney Supp.1996) (the "Act"), as applied to individuals who committed their crimes before the Act took effect. Their *ex post facto* claim having been rejected by the Second Circuit, plaintiffs now press their due process claims, contending that the Act, on its face and as applied, deprives them of their right to due process of law under the Fourteenth Amendment.

Two groups of individuals seek relief. First, the named plaintiffs represent the class of those convicted sex offenders who were on probation or parole on January 21, 1996, the date the Act took effect, and who were administratively given risk level classifications (the "Probationer–Parolee class"). Second, plaintiffs seek to add an additional class of plaintiffs, comprised of individuals who were still incarcerated on January 21, 1996, but who have been or will be released from custody and assigned risk level classifications at judicial hearings pursuant to § 168–*n* of the Act (the "Proposed Additional class").

Before the Court are (i) the parties' cross-motions for summary judgment with respect to the claims of the Probationer–Parolee class, (ii) plaintiffs' motion for leave to amend the complaint to add claims on behalf of the Proposed Additional class, and (iii) plaintiffs' motion for a preliminary injunction in favor of the Proposed Additional class.

For the reasons set forth more fully below, plaintiffs' motions are granted and defendants' cross-motion for summary judgment is denied, for I hold that plaintiffs are entitled to due process in the classification proceedings under the Act and that plaintiffs have not been afforded the minimal due process protection required by the Constitution.

The case of proposed plaintiff Charles Coe illustrates vividly the deficiencies in the process of assigning risk levels under the Act. Coe pled guilty in 1990 to attempted sexual abuse for kissing a neighbor and touching her breasts while riding in an elevator. At his sentencing in December 1990, the court noted that Coe suffered from borderline mental retardation. In December 1996, Coe received a notice advising him that the court was required to make a "final determination" of his risk level under the Act. The notice did not advise Coe of his proposed classification

or the ramifications thereof. Although he had been found indigent and was represented by Legal Aid in the earlier criminal proceedings, no lawyer was notified to appear at the classification hearing on his behalf. (Hendricks Decl. ¶¶ 11–12 & Ex. B).

At the classification hearing, the court read from a document, provided by the Board of Examiners of Sex Offenders (the "Board"), that incorrectly described the case as one that involved, not kissing and grabbing someone on an elevator, but sexual contact with a 15–year–old girl, including pulling her pants down and lying on top of her. The report stated, incorrectly, that Coe had been charged with rape. The court noted that the Board had recommended that Coe be classified at risk level two, and ruled that it was going to "adhere" to the Board's recommendation. (Hendricks Decl. ¶¶ 13–14 & Ex. C at 2; *compare* Hendricks Decl. Ex. B).

Coe, who appeared without a lawyer, attempted to tell the court that "[t]he description of the crime ... [was] totally different from what originally happened." (Hendricks Decl. Ex. C at 3). The court responded as follows:

> The Board has given me a summary of what happened, and the Board—based upon what they have recommended that you receive, risk level two, I don't agree with it wholly, but the law is there and I must carry it out as long as I sit on the bench. . . .

(*Id.* at 4). The court refused to change its classification of Coe as a risk level two. The court did not inform Coe that he had a right to a lawyer. The court did advise Coe to contact a lawyer and apparently gave him the name and telephone number of Legal Aid, but the court did not do so until after it had classified Coe as a risk level two. (*Id.* at 4–7).

Coe did contact Legal Aid at that point, and a timely notice of appeal was filed on his behalf. The Appellate Division, First Department, however, dismissed the appeal *sua sponte,* holding that "[n]o avenue exists to appeal a judicial determination of a sex offender's risk assessment under [the Act]." 240 A.D.2d 351, 660 N.Y.S.2d 714, 714 (1st Dep't 1997). Although the court stated that "we recognize that the lack of provision for appellate review may raise constitutional questions as to this portion of the statute," the court held that "that issue is not before us." *Id.* Coe then sought review from the New York State Court of Appeals, but his application for leave to appeal was denied. 91 N.Y.2d 912, 669 N.Y.S.2d 256, 692 N.E.2d 125 (Ct.App.1998).

Hence, Coe was assigned risk level two, a classification that subjects him to community notification, on the basis of an incorrect report that recited facts from the wrong case. Moreover, the "hearing" could not have lasted much more than five minutes, and Coe, who apparently was indigent and borderline mentally retarded, was not provided with counsel or prior notice of the Board's recommendation or disclosure of the evidence relied on by the Board. Although the court noted that it did not "wholly" agree with the Board, it concluded that it was required to adhere to the Board's recommendation. Despite these serious problems in the proceedings, Coe was not permitted to appeal.

The case of Samuel Poe provides another example. Poe was convicted of attempted sodomy in 1989. On March 26, 1997, he was produced from prison for a classification hearing. The transcript of the hearing—which is reproduced here in its entirety—speaks for itself:

THE CLERK: Bring out [Mr. Samuel Poe].

THE COURT: Let's see what they say about him.

(Whereupon, the defendant was escorted into the courtroom.)

THE CLERK: People versus [Samuel Poe].

[THE ASSISTANT DISTRICT ATTORNEY]: This is [Poe]?

THE COURT: Mr. [Poe], you're basically here for me to make a risk offender assessment in the case.

They've assessed you a total of a hundred and twenty points. Is there anything about that that you contest?

THE DEFENDANT: Yes. I don't even know what a hundred and twenty points means.

THE COURT: Okay. That means you're risk level three.

THE DEFENDANT: First of all, I didn't do the crime.

THE COURT: That's a separate matter.

THE DEFENDANT: Okay. Second of all, for twenty-five years I went from house to house. I'm a plumber. I went from house to house, to house to house. Never had a complaint of any kind. I can't see how I can be a risk of any kind.

THE COURT: Okay. Is that what you wanted to tell me about it?

THE DEFENDANT: I don't know what else to tell you. I haven't talked to anyone. I haven't been able to hear anyone.

THE COURT: I'll just confirm this risk level three that they said after a hearing, after hearing from you. I appreciate it.

THE CLERK: Hold on a second. This is for him. Bring out Mr. Rahman.

THE COURT: Have a good day.

(Hendricks Reply Decl. Ex. A at 2–3). The entire proceeding could not have lasted more than two minutes. Although the assignment of risk level three subjected Poe to the highest level of community notification, he was not represented by counsel; he was not advised that he had a right to counsel; he apparently did not understand what the 120 points meant; he was not advised how the 120 points were calculated; and he was given no meaningful opportunity to challenge his classification. The court undertook no independent review of the Board's risk level recommendation, nor was Poe even provided with a copy of the risk assessment instrument or the case summary.

These two cases provide stark examples of the lack of process provided under the Act. A system that permits a convicted sex offender to be classified at a risk level that subjects him to community notification on the basis of a perfunctory proceeding or incorrect information, that fails to provide a full and fair opportunity to be heard or legal representa-

tion, that places the burden on him to prove that the Board's findings were wrong without disclosing to him the bases for those findings, and that offers no avenue for appellate review even in the face of gross error does not pass constitutional muster.

Accordingly, injunctive relief will be granted in favor of plaintiffs, permanently as to members of the Probationer–Parolee class and preliminarily as to members of the Proposed Additional class. Defendants may proceed with the implementation of the Act, but they may not classify members of the Probationer–Parolee class or the Proposed Additional class higher than a risk level one unless these individuals are first given new hearings that comport with the requirements of due process as set forth below.

### STATEMENT OF THE CASE

#### A. Background

The substantive provisions of the Act and much of the factual background are set forth in detail in my prior opinions, see Doe v. Pataki, 919 F.Supp. 691 (S.D.N.Y.1996), and Doe v. Pataki, 940 F.Supp. 603 (S.D.N.Y. 1996), as well as in the Second Circuit's opinion affirming in part and reversing in part. See Doe v. Pataki, 120 F.3d 1263 (2d Cir.1997). The discussions of the Act's provisions and the facts contained in those opinions are incorporated herein. I now summarize the key provisions and facts relevant to the due process claims now before the Court.

#### 1. The Act

#### a. The Risk Levels

Pursuant to § 168–l of the Act, the five-person Board was created and charged with the task of developing a series of guidelines and procedures to be used in assessing the risk of repeat offense by a sex offender and in determining an offender's risk level. See § 168–l (5). The risk assessment guidelines, developed with the assistance of a group of experts with experience in dealing with sex offenders, call for the drafting of a risk assessment instrument for each convicted sex offender subject to the Act, which contains a series of factors relating to the offender's

current offense, his criminal history, his post-offense behavior, and his release environment.

The Act establishes three levels of risk to which an offender may be assigned, depending on the danger the offender poses to the community: level one (low risk), level two (moderate risk), and level three (high risk). *See* § 168–*l* (6). Whether a convicted sex offender is to be classified at risk level one, two, or three is determined by consideration of approximately 15 factors, weighted and totalled to arrive at a score that purports to indicate his likelihood to commit a repeat offense.

### b. *Incarcerated Sex Offenders*

For convicted sex offenders in state custody, the Department of Correctional Services ("DOCS") notifies the Board when an individual who is subject to the Act is about to be released from prison or jail. The Board then assesses the offender's risk and forwards a risk level recommendation to the sentencing court within 60 days prior to the offender's release from custody. *See* § 168–*l* (6). A board member is assigned to perform the initial review of the offender's file, which includes, among other things, the pre-sentence investigation prepared for the current offense, pre-sentence investigations for prior felony offenses, the sentencing court's commitment papers, papers generated by the offender, including legal papers generated by the offender and information concerning the offender's disciplinary history. The initial reviewer also receives the offender's criminal history from the Division of Criminal Justice Services ("DCJS") as well as quarterly reviews of the offender prepared by the offender's corrections counselor.

If certain aspects of the offender's case are unclear or more information is necessary, the Board member is required to make the necessary contacts to gather the pertinent information. Thus, the Board member performing the initial review may obtain information concerning the offender from a variety of sources, including the prosecuting District Attorney's office, the courts, probation and parole departments and officers, DOCS computerized databases, and even the offender himself, in the form of his statements at the time of the arrest, at the time of the presentence investigation, and while serving his time in the DOCS system. The offender is also entitled to submit any relevant information for the Board's consideration. After a review of the offender's file and all other available information, the Board member completes the risk assessment instrument by assigning points for each relevant factor contained in the guidelines, drafts a case summary, and makes a risk level recommendation.

After the initial review, the file is assigned to a second reviewer, who conducts an independent review of the offender's case. The initial assessment is reviewed for accuracy and agreement with the recommended risk level. If the second reviewer agrees with the recommended risk level, he or she initials the file, and the file is then assigned to a third reviewer. Again, if the third reviewer agrees with the recommendation, he or she initials the file. Three of the five Board members must agree on a risk level recommendation before it is forwarded to the sentencing court. If the three Board members assigned to a particular case cannot agree, a fourth Board member examines the file.

The risk level recommendation and case summary are then forwarded to the sentencing court for a final risk level determination. The offender's file itself, containing the information upon which the recommendation is based, is not automatically forwarded to the court, but the Board will forward the primary information relied upon if requested by the court. The Act provides that the Board's recommendation to the court is "confidential and shall not be available for public inspection." § 168–*l* (6).

The sentencing court has 30 days within which to render a final decision on the offender's risk level classification. Section 168–*n* (3) requires the court to "allow the sex offender to appear and be heard." Within the 30–day period, the court must set a date for the offender's classification proceeding, provide notice to the offender of this proceeding, arrange for the offender's production from prison, assign counsel for the offender "if necessary," *see* § 168–*n* (3), review

the Board's risk level recommendation and case summary and any other materials submitted by the offender, determine the offender's risk level classification, and inform the offender of his risk level and the consequences thereof. In the vast majority of cases, the court affirms the risk level recommendation submitted by the Board.

### c. *Probationer–Parolee Offenders*

For convicted sex offenders who were already on probation or parole on the date the Act took effect, the procedures for risk level classification were somewhat different. The risk level classifications for all of these individuals were made either by the Department of Probation and Correctional Alternatives ("Probation") or the Division of Parole ("Parole"), with assistance from the Board. *See* § 168–*g* (1). Probation and Parole employees who assigned risk levels received one day of training in the application of the Act and the guidelines promulgated thereunder, and in the principles underlying the guidelines. A Probation or Parole staff member accessed the offender's file containing the necessary information for application of the guidelines and completed the initial risk level assessment. The case was then assigned to a member of the Board or a designee for final review. Ultimately, a Parole or Probation representative signed off on the offender's risk level assessment.

The offenders in this group received no advance notice of their administrative classification proceeding. They were merely informed in writing of their risk level, the duties imposed on them by the Act, and their right to administratively appeal the agency's determination regarding their classification level, in writing within 20 days. If the offender chose to administratively appeal, he was assigned risk level one pending resolution of the appeal.

### 2. *The Facts*

### a. *The Probationer–Parolee Class*

The Probationer–Parolee class represents convicted sex offenders who committed their crimes prior to January 21, 1996, the date the Act took effect, and who were on proba-

tion or parole on the effective date of the Act. The risk level classifications for all of these individuals were made by Probation or Parole in accordance with the procedures described above. I will now briefly discuss the specific facts pertaining to the representatives of this class.

### (1) *John Doe*

Plaintiff John Doe was convicted of attempted rape in the first degree in New York in 1990 and was sentenced to a period of incarceration. He was released on parole in 1994 and has remained on parole since then without incident. (Stip.¶ 6). On February 5, 1996, while on parole, Doe received a one-page notification that he had been classified by Parole as a level three sex offender and that he was thus "subject to lifetime registration and . . . must register quarterly." (*Id.* ¶ 39). He was advised that he could petition the sentencing court to be relieved from registering, but not for "at least 10 years." (*Id.*) The notice also advised Doe that he could administratively appeal his classification level in writing, but the notice contained no information concerning the factors relied upon by Parole in classifying him as risk level three or what factors should be addressed in an appeal. (*Id.*)

The risk assessment instrument prepared by Parole shows that Doe was initially given a score that placed him at the lower end of the level two range. The individuals from Parole who reviewed Doe's case, however, departed from this presumptive risk level and classified him at risk level three based on comments Doe allegedly made suggesting that he did not accept responsibility for his crime. (*Id.* ¶ 41). Doe was never informed that an override had been applied to him. (*Id.* ¶ 44).

### (2) *Richard Roe*

Plaintiff Richard Roe was convicted of sexual abuse in the first degree in New York in 1995. He was sentenced to probation and has remained on probation without incident since then. (*Id.* ¶ 7). Roe was administratively assigned risk level three by Probation. (*Id.* ¶ 42). Like Doe, Roe received written notice of his risk level classification, but the

notice provided no information concerning the factors relied upon by Probation. The notice advised Roe of his right to file an administrative appeal of Probation's decision and advised him to state in his appeal why he believed the risk level was incorrect. (*Id.*)

The risk assessment instrument prepared by Probation shows that, like Doe, Roe was also initially given a score that placed him at the lower end of the level two range. Reviewers from Parole departed from this presumptive risk level and classified him at risk level three based on application of an override factor created by the Board. In the reviewers' opinion, Roe had a mental abnormality that "decreases [his] ability to control impulsive sexual behavior," even though his file noted that his condition was "controlled by medication." (*Id.* ¶ 43). Roe was never informed that an override had been applied to him. (*Id.* ¶ 44).

Plaintiffs Doe and Roe sue on behalf of themselves as well as all others similarly situated—all persons who, on January 21, 1996, the effective date of the Act, were on parole or probation after having been convicted of a "sex offense" or "sexually violent offense" as defined in the Act, *see* § 168–a (2) & (3), committed prior to the effective date of the Act, and who have been or will be subject to the Act's registration and notification provisions. (Cmplt.¶ 35).

### b. *The Proposed Additional Class*

The Proposed Additional class represents convicted sex offenders who committed their crimes prior to January 21, 1996, the date the Act took effect, but who were still incarcerated on that date. All of the members of this class were or will be assigned risk level classifications at a judicial hearing. I will now briefly discuss the specific facts pertaining to the representatives of this class.

### (1) *Samuel Poe*

The facts relating to plaintiff Samuel Poe are set forth above at pages 460–61. (*See also* Stip. ¶ 8; Hendricks Decl. ¶¶ 9–10; Hendricks Reply Decl. ¶¶ 3–5 & Ex. A). Poe is one of the original named plaintiffs. At the time the action was filed, he was incarcerated and therefore had not yet been as-

signed a risk level, either administratively or judicially. As Poe has since been judicially classified, he now properly belongs in the Proposed Additional class.

### (2) *Charles Coe*

The facts relating to proposed plaintiff Charles Coe are set forth above at pages 459–60. (*See also* Hendricks Decl. ¶¶ 11–18 & Exs. B, C).

### (3) *Frank Loe*

Proposed plaintiff Frank Loe pled guilty to first degree rape in 1979. He was released on parole in 1989, but was in and out of prison for drug use until he was produced from prison on October 6, 1997 to attend his classification hearing. (*Id.* ¶¶ 20–21).

His classification hearing was scheduled for a Monday afternoon, but Loe was not notified of the hearing until the Friday before, and thus was unable to retrieve his case file on such short notice. A Legal Aid attorney was assigned to represent him at the hearing, but this attorney was unfamiliar with Loe's case. In fact, she did not receive any information about Loe at all until she arrived at court for the hearing, when she was provided with Loe's risk assessment instrument and case summary prepared by the Board, which recommended that Loe be classified at level three. (*Id.* ¶ 21). Loe had only a few minutes to confer with his attorney before his case was called. His attorney requested an adjournment of two to three weeks in order to more adequately prepare for the classification hearing. (*Id.* ¶ 22). The judge, however, granted only a one-day adjournment. (*Id.* ¶ 23).

When Loe's classification hearing reconvened the following day, Loe's attorney identified several factors in the risk assessment instrument that she believed were not supported by any evidence and asked the court to sign a subpoena to obtain the file relied upon by the Board in making its risk level recommendation. Loe's attorney also informed the court that Loe had received sex offender treatment and asked for an opportunity to investigate that treatment and other potential mitigating evidence. The prosecu-

tor then challenged Loe to take the witness stand and disprove the evidence that the Board relied upon. The court affirmed the Board's recommendation of risk level three without taking any testimony and relying solely on the documents submitted by the Board. (*Id.* ¶ 24). When Loe's attorney attempted to file a notice of appeal, the clerk refused to accept it, stating that the Appellate Division had instructed all clerks not to accept notices of appeal in sex offender cases. (*Id.* ¶ 25).

### (4) *William Woe*

William Woe was convicted of first degree sodomy and other sex crimes. He is presently in a state prison, but will be eligible for conditional release or parole next year. Accordingly, Woe will be subject to judicial classification as a sex offender prior to his release. He has indicated that he has no funds to retain an attorney to represent him at his classification hearing and is concerned that he will not be assigned counsel to assist him. (*Id.* ¶ 26).

### B. *Prior Proceedings*

This case was filed on March 6, 1996, two days before New York's "900" telephone number service was to become operational. The Probationer–Parolee class immediately moved by order to show cause for a preliminary injunction and a temporary restraining order, challenging the Act's registration and notification provisions on *ex post facto*, due process, and statutory grounds. On March 7, 1996, I issued a temporary restraining order, enjoining defendants from enforcing the notification provisions of the Act.

On March 18, 1996, I heard full arguments on the motion for a preliminary injunction. At the conclusion of the hearing, I continued the restraining order pending a decision on plaintiffs' motion for a preliminary injunction.

On March 21, 1996, I held that the Act's notification provisions were punitive in nature and that therefore their retroactive application violated the *Ex Post Facto* Clause. I issued a preliminary injunction enjoining their retroactive application pending the outcome of this lawsuit. *Doe v. Pataki,* 919 F.Supp. at 693, 700–02. I declined, however,

to enjoin retroactive application of the Act's registration provisions because I did not believe that plaintiffs would suffer irreparable harm if they were simply required to register. *Id.* at 693, 698.

After discovery, the parties cross-moved for summary judgment. On September 24, 1996, I granted in part plaintiffs' motion for summary judgment, holding that retroactive application of the notification provisions of the Act violated the *Ex Post Facto* Clause, and permanently enjoined defendants from enforcing the public notification provisions of the Act against persons who committed their crimes before January 21, 1996. I also granted in part defendants' motion for summary judgment, dismissing with prejudice plaintiffs' *ex post facto* challenge to retroactive application of the registration provisions of the Act. I had no need to reach the due process and statutory claims and therefore dismissed them without prejudice as moot. *Doe v. Pataki,* 940 F.Supp. at 605, 630–31.

Both sides appealed to the Court of Appeals for the Second Circuit. In a decision rendered on August 22, 1997, the Second Circuit affirmed in part and reversed in part, holding that neither the registration nor the notification provisions of the Act constitute punishment for purposes of the *Ex Post Facto* Clause, and that both sets of provisions may be imposed upon sex offenders convicted before the Act's effective date. The Court then remanded the case for consideration of plaintiffs' remaining claims. *See Doe v. Pataki,* 120 F.3d at 1265–66. Plaintiffs thereafter filed a petition for *certiorari* to the United States Supreme Court, which was denied on February 23, 1998. *Doe v. Pataki,* —— U.S. ——, 118 S.Ct. 1066, 140 L.Ed.2d 126 (1998).

### C. *Present Proceedings*

Following the denial of *certiorari,* I conferenced the case on March 11, 1998. Counsel for plaintiffs informed the Court that it was contemplating amending the complaint to add a new class of plaintiffs who had due process claims similar to those of the existing plaintiffs. Since the case was first filed in March of 1996, many convicted sex offenders

who had previously been incarcerated at the time the Act took effect had been released from state custody and been assigned risk levels pursuant to § 168-n of the Act, but anecdotal evidence indicated that many of these individuals' classification hearings were being carried out in a summary fashion, and plaintiffs' counsel were concerned that these individuals, too, were being deprived of their right to procedural due process.

Plaintiffs again moved for a temporary restraining order, this time seeking an order enjoining application of the notification provisions to both the Probationer–Parolee class and the Proposed Additional class. I held oral argument on plaintiffs' motion for a temporary restraining order on March 16, 1998.

Ruling from the bench, I granted plaintiffs' motion in part. I held that defendants could proceed with the implementation of the notification provisions, but that convicted sex offenders who committed their crimes prior to January 21, 1996, and who on that day were on probation or parole or who were incarcerated could not be classified any higher than risk level one pending further order of the Court, unless they were first given a hearing before a court, upon adequate prior notice, that comports with the requirements of procedural due process. Even though the Proposed Additional class had not yet been formally added to the action, I included that group for purposes of the temporary restraining order to preserve my jurisdiction.

I then set a briefing schedule for plaintiffs' motion for a preliminary injunction and to amend the complaint. The parties agreed that they would make no further submissions with respect to the Probationer–Parolee class and would rest on their prior summary judgment papers. Accordingly, for this group, I combine the motion for a preliminary injunction with the merits and address the Probationer–Parolee class members' claims on cross-motions for summary judgment. Plaintiffs' motion is for a permanent injunction, and defendants' motion seeks dismissal of plaintiffs' claims with prejudice. As for the Proposed Additional class, I have before me plaintiffs' motions for leave to amend the complaint and for a preliminary injunction. Defendants oppose both motions.

## DISCUSSION

I address first the general issues pertaining to the due process claims, including whether plaintiffs have a protected liberty interest and, if so, what process is due. I next apply these principles, first to the Probationer–Parolee class and then to the Proposed Additional class.

### A. The Due Process Clause

The Fourteenth Amendment to the United States Constitution provides that no person shall be deprived of life, liberty, or property without due process of law. U.S. Const. amend. XIV, § 1. To establish a claim under the Due Process Clause, a plaintiff must demonstrate that he possesses a constitutionally protected interest in life, liberty, or property, and that state action has deprived him of that interest. *Valmonte v. Bane,* 18 F.3d 992, 998 (2d Cir.1994).

The Supreme Court has stated that procedural due process claims are to be examined "in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989) (citations omitted). I therefore apply this two-step analysis.

### 1. Is There a Protected Liberty Interest at Stake?

Defendants contend that the members of the Probationer–Parolee class have no cognizable procedural due process claim because no constitutionally protected liberty interest is implicated through community notification of their status as convicted sex offenders. Plaintiffs, in contrast, assert that "the risk of being indelibly branded a dangerous sex offender likely to commit more sex crimes, a designation that brings assured humiliation and public obloquy and possible harassment, ostracism, loss of employment, [loss of] housing, and even physical attacks" (Pltfs. Mem. Supp. Summ. J. at 44–45), clearly invokes a

liberty interest that entitles them to the protection of procedural due process.

Whether governmental action that tarnishes an individual's good name and reputation invokes a federally-protected liberty interest has been the subject of numerous Supreme Court and Second Circuit decisions. In *Wisconsin v. Constantineau*, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971), for example, the United States Supreme Court held that a protectible liberty interest may be implicated "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him." *Id.* at 443, 91 S.Ct. 507. The Court confronted the issue again a year later in *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), holding that a government employee's liberty interest would be implicated if the charges for which he was dismissed imposed on him "a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities." *Id.* at 573, 92 S.Ct. 2701.

In *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), the Supreme Court clarified, however, that "reputation alone, apart from some more tangible interests such as employment, is [n]either 'liberty' or 'property' by itself sufficient to invoke the procedural protection of the Due Process Clause." *Id.* at 701, 96 S.Ct. 1155. Rather, the governmental action must "alter 'a right or status previously recognized by state law,' for it is that 'alteration, officially removing the interest from the recognition [and protection] previously afforded by the State, which [the Court has] found sufficient to invoke the procedural guarantees contained in the Due Process Clause of the Fourteenth Amendment.'" *W.P. v. Poritz*, 931 F.Supp. 1199, 1219 (D.N.J.1996) (quoting *Doe v. Poritz*, 142 N.J. 1, 662 A.2d 367, 418 (1995), and *Paul*, 424 U.S. at 711, 96 S.Ct. 1155), *rev'd on other grounds, E.B. v. Verniero*, 119 F.3d 1077 (3d Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1039, 140 L.Ed.2d 105 (1998).

■ Thus, courts have interpreted *Paul* to require "stigma plus," *i.e.*, harm to reputation in addition to some other impediment, to establish a constitutional deprivation. *See, e.g., Valmonte v. Bane*, 18 F.3d at 999; *Neu*

*v. Corcoran*, 869 F.2d 662, 667 (2d Cir.), *cert. denied*, 493 U.S. 816, 110 S.Ct. 66, 107 L.Ed.2d 33 (1989). I must therefore assess whether plaintiffs have established damage to reputation and impairment of some additional interest.

■ Plaintiffs satisfy both requirements of the "stigma plus" test. First, plaintiffs have convincingly demonstrated that, when implemented, the community notification provisions of the Act will likely result in their being branded as convicted sex offenders who may strike again and who therefore pose a danger to the community. While defendants correctly note that one's name, physical appearance, and criminal history are all matters of public record in which one has no privacy interest, *see United States v. Dionisio*, 410 U.S. 1, 14, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973); *Doe v. City of New York*, 15 F.3d 264, 268 (2d Cir.1994), the Act makes such information readily available to the community at large, and in some cases, provides for immediate dissemination of such information on a widespread basis.

For example, all convicted sex offenders are subject to dissemination of information concerning their status as a sex offender, the nature of their crime, and their specific risk level classification via the special "900" telephone number accessible by any member of the community. *See* § 168–*p*. Level two offenders are subject to dissemination of the above information, in addition to "background information," a photograph, and an approximate address, by local police departments to "any entity with vulnerable populations." *See* § 168–*l* (6)(b). Finally, level three offenders are subject to general dissemination of their exact address, in addition to the identifying information relevant to level two offenders. *See* § 168–*l* (6)(c). Furthermore, with respect to level two and three sex offenders, entities that receive the information about an individual may disseminate such information "at their discretion." *See* § 168–*l* (6)(b), (c).

As the experiences of convicted sex offenders subject to similar requirements in other jurisdictions has shown, *see Doe v. Pataki*, 940 F.Supp. at 608–11, such widespread dis-

semination of the above information is likely to carry with it shame, humiliation, ostracism, loss of employment and decreased opportunities for employment, perhaps even physical violence, and a multitude of other adverse consequences. Thus, there is no genuine dispute that the dissemination of the information contemplated by the Act to the community at large is potentially harmful to plaintiffs' personal reputations.

Moreover, the registration provisions of the Act place a "tangible burden" on plaintiffs, potentially for the rest of their lives. *See Valmonte v. Bane*, 18 F.3d at 1001. All convicted sex offenders subject to the Act must adhere to its registration requirements. Any offender convicted of a "sex offense" or a "sexually violent offense" must register with the DCJS as a sex offender by filling out a form prepared by DCJS. *See* §§ 168–*f* & –*g*. Registration information includes the offender's name, address, physical details, photograph, fingerprints, facts about the sex offense committed by the offender, and any other information deemed pertinent by DCJS. *See* § 168–*b*. DCJS then transmits this information to local police departments.[1]

Each sex offender must then re-register on a yearly basis for 10 years, and any sex offender who is further classified as a sexually violent predator must personally register at a local police station every 90 days for a minimum of ten years, and potentially for the rest of his life. *See* § 168–*h*. Failure to timely register subjects the convicted sex offender to criminal prosecution. *See* § 168–*t*. In light of these requirements placed on registrants, there can be no genuine dispute that registration alters the legal status of all convicted sex offenders subject to the Act for a minimum of ten years and, for some, permanently. These requirements obviously encroach on the liberty of convicted sex offenders, and, therefore, they suffer a tangible impairment of a right in addition to mere harm to reputation.

Finally, other courts have held that a liberty interest protected by the Due Process Clause is implicated when convicted sex offenders are subject to registration and notification pursuant to sex offender registration laws. For example, the New Jersey Supreme Court, in analyzing the constitutionality of New Jersey's Megan's Law, found that "[t]he harm to [registrants'] reputation[s], when coupled with the incursion on his right of privacy ... constitutes a protectible interest" under both the federal and New Jersey Constitutions. *Doe v. Poritz*, 142 N.J. 1, 662 A.2d 367, 419 (1995). The District of New Jersey, expanding on the New Jersey Supreme Court's analysis, stated that "[s]uch a result may also be reached by coupling the reputational damage with the loss of employment opportunities or ... the continuing legal status as a registrant and the duties imposed as a result." *W.P. v. Poritz*, 931 F.Supp. at 1219 (footnote omitted). *See also Roe v. Farwell*, 999 F.Supp. 174, 196 (D.Mass.1998); *Cutshall v. Sundquist*, 980 F.Supp. 928, 933–34 (M.D.Tenn.1997). There is no reason to hold differently here. I agree with these courts, and thus I hold that plaintiffs have a protected liberty interest that entitles them to procedural due process.

### 2. *What Process is Due?*

The next issue is what process is due convicted sex offenders prior to risk level classification and community notification of their sex offender status. The Probationer–Parolee plaintiffs contend that because they were administratively assigned risk level classifications, they were deprived of the fundamental elements of due process: notice and an opportunity to be heard. The Proposed Additional class members argue that, even though they were judicially classified, the procedures implemented at their hearings were so deficient that they, too, were deprived of due process. Defendants, on the other hand, assert that the existing procedures as they have been implemented by the Board and the New York State courts afford

---

1. Convicted sex offenders who were on parole or probation on the date the Act took effect were required to register with their parole or probation officers. *See* § 168–*g*. The parole and probation officers, in turn, were required to notify the local police department of the registered sex offender's address and the nature of his or her crime, *see* § 168–*c* (3), and forward the completed registration forms to DCJS.

all the process that is constitutionally required.

As the Supreme Court has noted, due process is not a fixed concept, but rather a flexible one that depends on the particular circumstances. *Zinermon v. Burch,* 494 U.S. 113, 127, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). "Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." *Wisconsin v. Constantineau,* 400 U.S. 433, 437, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971); *accord United States v. James Daniel Good Real Property,* 510 U.S. 43, 53, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993) ("The right to prior notice and a hearing is central to the Constitution's command of due process."). The minimum requirements of due process therefore are notice and an opportunity to be heard, and the hearing must be held at a meaningful time and in a meaningful manner. *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965).

Traditionally, the extent of process due an individual subject to a possible deprivation of a protected liberty or property interest is analyzed under the framework of *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). In *Mathews v. Eldridge,* the Supreme Court articulated a three factor balancing test for evaluating "when, under our constitutional system, judicial-type procedures must be imposed upon administrative action to assure fairness." *Id.* at 348, 96 S.Ct. 893. As the Court stated:

> [O]ur prior decisions indicate that identification of the specific dictate of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the [state's] interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 334–35, 96 S.Ct. 893. I turn now to a discussion of the *Mathews v. Eldridge* factors as they apply to the present context to determine what process is due a convicted sex offender in a risk level classification proceeding.

### a. *Private Interests*

The convicted sex offender's private interests in his liberty and reputation are substantial. For the reasons set forth above and in my prior decisions, the convicted sex offender's private interests will be significantly affected by registration and community notification.

Not only will registration and notification likely affect every aspect of the offender's life, according to the terms of the Act they will do so for a minimum of ten years. *See* § 168–*h.* A convicted sex offender subject to the Act thus has a compelling interest in being accurately assigned a risk level classification. *See E.B. v. Verniero,* 119 F.3d 1077, 1107 (3d Cir.1997), *cert. denied,* — U.S. ——, 118 S.Ct. 1039, 140 L.Ed.2d 105 (1998); *cf. Fusari v. Steinberg,* 419 U.S. 379, 389, 95 S.Ct. 533, 42 L.Ed.2d 521 (1975) (noting that "the possible length of wrongful deprivation ... is an important factor in assessing the impact of official action on the private interests").

### b. *Risk of an Erroneous Deprivation*

The nature of the classification proceeding carries with it a high risk of error. The Act itself calls for the Board to furnish the initial risk level recommendation, but plaintiffs contend that the manner in which the classification proceedings are being carried out prevents them from effectively challenging or overcoming the Board's recommendation. Indeed, all of the procedural deficiencies claimed by plaintiffs center on the same harm: erroneous assignment of a risk level and/or erroneous classification as a sex offender at all.

In considering the impact of an erroneous determination of a sex offender's risk level, the Third Circuit stated as follows:

> An erroneous underestimation of an individual's dangerousness will not necessarily result in harm to protected groups. Registration alone, which Megan's Law

mandates regardless of an offender's classification, allows law enforcement officials to monitor offenders and provides considerable disincentive to offenders to commit criminal acts because of the high likelihood of being apprehended. On the other hand, an overestimation of an individual's dangerousness will lead to immediate and irreparable harm to the offender: his conviction becomes public, he is officially recorded as being a danger to the community, and the veil of relative anonymity behind which he might have existed disappears.

*E.B. v. Verniero*, 119 F.3d at 1110. The same is true for convicted sex offenders in New York subject to the Act, and, thus, the risk of error must weigh in favor of greater procedural safeguards before a final risk level can be assigned and notification can go forward.

### c. *Countervailing State Interest*

The state, on the other hand, "has a compelling interest in protecting its citizens by giving prompt notification to potential victims and relevant caregivers with respect to registrants who are accurately determined to be [level two] or [level three] risks." *E.B. v. Verniero*, 119 F.3d at 1107. The state thus has an interest in having an expedited, summary process "without the burden of a new adversary criminal trial," *Morrissey v. Brewer*, 408 U.S. 471, 483, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), the financial costs of which would be onerous.

The state, however, also has an interest in ensuring that its classification and notification system is both fair and accurate. Therefore, it has no interest in classifying a convicted sex offender without procedural guarantees, *see Morrissey*, 408 U.S. at 483, or in making erroneous classifications and overbroad notifications. *See E.B. v. Verniero*, 119 F.3d at 1107–08 ("[T]he state has no substantial interest in notifying persons who will not come into contact with the registrant; nor has it any interest in notifying those who will come into contact with a registrant who has erroneously been identified as a moderate or high risk.").

### d. *Balancing of the Interests*

█ The question of what process is due convicted sex offenders at their risk level classification hearings is a difficult one, given the unique nature of the proceeding itself. It falls somewhere between a criminal proceeding in which a defendant is entitled to a "full panoply of rights," *Morrissey v. Brewer*, 408 U.S. at 480, 92 S.Ct. 2593, and a simple administrative proceeding, in which participants have traditionally been afforded less process. Certainly, the due process protections required for a risk level classification proceeding "are not as extensive as those required in a plenary criminal or civil trial." *W.P. v. Poritz*, 931 F.Supp. at 1222. On the other hand, the consequences of registration and notification under the Act are sufficiently serious to warrant more than mere summary process. The New Jersey Supreme Court and the Third Circuit have thoroughly considered the requirements of procedural due process in the context of sex offender registration laws. An examination of these courts' decisions is therefore instructive.

In *Doe v. Poritz*, 142 N.J. 1, 662 A.2d 367 (1995), the New Jersey Supreme Court analyzed New Jersey's Megan's Law and decided, as an initial matter, that judicial review of the state's tier classification of the offender was of paramount importance. *Id.* at 382. The court then set forth a list of procedures that would be required before a sex offender could be subject to community notification. This list included, *inter alia*:

(1) judicial review of the state's proposed tier level prior to notification, in the form of a hearing before a state court judge;

(2) written notice to the offender, at least two weeks in advance of the proceeding, detailing the proposed tier level and the specific manner proposed for notification;

(3) the right to be represented by retained counsel, or, if he cannot afford it, to have free counsel appointed by the court;

(4) pre-hearing discovery of "all papers, documents, and other material, including the prosecutor's findings and statement of reasons for the level and manner of proposed notification";

(5) the burden of persuasion placed on the state to present *prima facie* evidence justi-

fying the proposed level and manner of notification; and

(6) the right to seek a stay of notification "to allow time for application to an appellate court."

*Id.* at 382–83; *see also W.P. v. Poritz,* 931 F.Supp. at 1220 (summarizing the scheme for judicial review laid out by the New Jersey Supreme Court). Thus, the New Jersey Supreme Court has determined that the nature of the classification proceeding is serious enough to require a pre-notification hearing accompanied by a comprehensive set of procedural safeguards to ensure the protection of convicted sex offenders' due process rights.

In *E.B. v. Verniero,* 119 F.3d 1077 (3d Cir.1997), *cert. denied,* — U.S. —, 118 S.Ct. 1039, 140 L.Ed.2d 105 (1998), the Third Circuit added to the list of procedures necessary to safeguard the constitutional rights of convicted sex offenders subject to registration and notification. Considering a separate challenge to the New Jersey law on procedural due process grounds, the Third Circuit addressed the issues of allocation of the burden of persuasion and the standard of proof governing the determination, and held that registrants are entitled to have the burden of persuasion placed on the state, with the state obligated to prove the proposed level and manner of notification by clear and convincing evidence. *Id.* at 1107–11.

Convicted sex offenders subject to New York's law should be afforded no less protection than offenders subject to the New Jersey law. I conclude therefore that convicted sex offenders subject to the Act are entitled to at least the minimum procedural protections outlined in *Doe* and *E.B. v. Verniero.*[2] Accordingly, I hold that in assigning risk levels to convicted sex offenders under the Act, the following procedures are required to satisfy procedural due process:

First, the offender facing risk level classification must be given a hearing before a court. Here, the Act itself provides for a judicial hearing at which the final risk level classification is to be assigned. *See* § 168–n. By the Act's very terms, then, every convicted sex offender subject to the Act is entitled to a judicial determination of his risk level classification.[3]

Second, the offender must be given notice of the classification proceeding, sufficiently in advance of the hearing to afford the affected individual an opportunity to prepare to challenge and rebut the state's contentions. The Supreme Court has stressed that "fair notice" is "the bedrock of any constitutionally fair procedure." *Lankford v. Idaho,* 500 U.S. 110, 121, 111 S.Ct. 1723, 114 L.Ed.2d 173 (1991); *see Goldberg v. Kelly,* 397 U.S. 254, 265–68, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

---

**2.** I acknowledge that the scheme under the New Jersey statute is somewhat different from that under the New York statute. Under the New Jersey law, the state assigns the tier level classifications to sex offenders, and the offender is then entitled to judicial review of that classification, in accordance with the procedural requirements set forth by the New Jersey Supreme Court, *before* notification to the community may go forward. In contrast, the New York law provides for the Board to make a recommendation to the sentencing court, who makes the final determination regarding risk level classification. While the sequence of events is indeed different in New Jersey, the bottom line is that the judicial hearing, with the attendant procedural safeguards, must occur prior to notification. Hence, the fact that the two states' schemes differ in certain respects does not render the due process analyses in *Doe* and *E.B.* inapplicable to the case before me.

**3.** In the absence of a substantial factual dispute, the hearing need not be conducted as a full evidentiary hearing with witnesses and direct

and cross-examination. In a federal sentencing, for example, the defendant, his attorney, and the government are provided, prior to sentencing, with a copy of the defendant's pre-sentencing report ("PSR"). Consequently, the defendant and his attorney are advised prior to sentencing of the probation department's recommended sentence as well as the considerations that led to the recommendation. Both the defendant and the government are given an opportunity to review the PSR and to make objections, directly to the probation department prior to sentencing as well as to the Court at sentencing. At the sentencing, the defendant, his attorney, and the government have an opportunity to address the Court, both as to any objections and also as to the sentence to be imposed by the Court. In the vast majority of sentences, there are no substantial factual disputes and an evidentiary hearing is not required. Risk level classification proceedings could be conducted in a similar fashion, with the Board's risk assessment instrument and recommendation disclosed to the offender and his attorney prior to the hearing.

Indeed, Supreme Court decisions have "repeatedly emphasized the importance of giving the parties sufficient notice to enable them to identify the issues on which a decision may turn." *Lankford*, 500 U.S. at 126 n. 22, 111 S.Ct. 1723.

Third, notice of the proceeding must contain a statement of the proceeding's purpose and the Board's recommended risk level classification. *See Doe*, 662 A.2d at 382 (stating that "written notice [of the review proceeding] shall inform the offender of the proposed level and specific manner and details of notification"); *cf. Morrissey v. Brewer*, 408 U.S. at 486–87 (an individual facing parole revocation must be "given notice that the hearing will take place and that its purpose is to determine whether there is probable cause to believe he has committed a parole violation[, and t]he notice should state what parole violations have been alleged").

Fourth, the offender must be given an opportunity to retain counsel, and counsel shall be appointed where he cannot afford to retain counsel himself. *See Doe*, 662 A.2d at 382 ("The notice shall inform the subject of the right to retain counsel ... If the offender does not have counsel, the court shall assign same"). Indeed, the Act itself provides for appointment of counsel "if necessary." *See* § 168–n.

Fifth, the offender must be given pre-hearing discovery of the evidence on which the Board's risk level recommendation is based. As the Supreme Court stated in *Morrissey*, the right to appear at the hearing and speak on one's own behalf and produce "letters, documents, or individuals who can give relevant information to the hearing officer" is one of the "minimum requirements of due process." 408 U.S. at 487, 488–89, 92 S.Ct. 2593. The Court recently reaffirmed this principle in the case of *Kansas v. Hendricks*, —— U.S. ——, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997), holding that before designating an individual a "sexually violent predator" for purposes of civil commitment, the individual must be given "the opportunity to review documentary evidence presented by the State." *Id.* at 2078. Finally, as the District Court of New Jersey noted in *W.P. v. Poritz*, in New Jersey, a classification

hearing can take place only after a registrant has received "extensive pre-hearing discovery" of all papers, documents, and other material relating to his proposed level and manner of notification. *W.P. v. Poritz*, 931 F.Supp. at 1220.

Sixth, the state must bear the burden of proof and must prove the facts supporting each risk factor upon which the risk level assessment is based by clear and convincing evidence. *See E.B. v. Verniero*, 119 F.3d at 1107–11.

Finally, the offender must have the right to appeal his risk level determination, in the case of the Probationer–Parolee class to a court and in the case of the Proposed Additional class to an appellate court. Even defendants imply that further judicial review of a risk level determination must be available to convicted sex offenders for the Act to comport with due process. Otherwise, defendants would not take the position that appeal is available through CPLR § 5701 or by way of a CPLR Article 78 proceeding. (*See* Morrison Decl. ¶ 17).

### B. *Application*

#### 1. *The Probationer–Parolee Class*

■ The requirements of procedural due process were not satisfied with respect to the Probationer–Parolee class. Members of this class were assigned risk level classifications administratively, by employees of Parole and Probation. These employees received one day of training in the application of the Act and the guidelines promulgated thereunder. The offenders received no advance notice of the administrative classification proceedings, nor were they given any opportunity to contribute relevant information prior to classification. They were merely informed in writing of their assigned risk level classification after the fact.

While members of this class were informed that they could administratively appeal the determination of their classification level, if they did so in writing within 20 days of receiving the notice, individuals who were on probation were told that if they chose to appeal, they had to state the reasons why they believed the risk level assignment was

incorrect. In effect, the burden of proof was placed on the offender to convince the reviewing body that he should be classified at a lower risk level.

Hence, the members of the Probationer–Parolee class, including class representatives Doe and Roe, were given no advance written notice of the classification proceeding or the recommended risk level classification; no hearing before an independent decision maker; no representation; no discovery of the materials used in making the risk level classification; and therefore no opportunity to rebut the evidence against them. Furthermore, the state employees who made the assessments were governed by no standard of proof. In short, members of this class were afforded none of the procedural protections identified to be essential in safeguarding the right to procedural due process, except that they were afforded the right to administratively appeal the determination of their risk level classification. Even that right, however, was rendered meaningless because the offender bore the burden of stating why the risk level assignment was incorrect, yet had no information concerning the basis for the assignment in the first place. Indeed, of the roughly 4,700 individuals comprising this class, less than ten percent even exercised their option to appeal, and only a handful of those received any relief through the appeal.

 In light of the foregoing, I hold that administrative classification of the members of the Probationer–Parolee class failed to satisfy the requirements of procedural due process and therefore these individuals' constitutional rights were violated by such action. Their risk level classifications were assigned without even the most fundamental elements of due process—notice and an opportunity to be heard. Accordingly, the Probationer–Parolee plaintiffs' motion for partial summary judgment is granted, and defendants' cross-motion for summary judgment is denied.[4]

### 2. The Proposed Additional Class

Plaintiffs's due process claims with respect to the Proposed Additional class are presented in the context of two motions: (a) a motion for leave to amend the complaint to add the Proposed Additional class as plaintiffs and (b) a motion for a preliminary injunction. In addition, I discuss separately defendants' contention that I lack subject matter jurisdiction over the claims of the Proposed Additional class under the Rooker–Feldman doctrine.

### a. The Motion for Leave to Amend the Complaint

 Rule 15(a) of the Federal Rules of Civil Procedure permits a party to amend a pleading after a responsive pleading has been served "only by leave of court or by written consent of the adverse party." Fed.R.Civ.P. 15(a). This rule also provides, however, that "leave shall be freely given when justice so requires," id., and determining when "justice so requires" rests within the sound discretion of the trial court. Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 330, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971). Absent a showing of prejudice to the opposing party, or undue delay or bad faith on the part of the movant, amendments are generally permitted. See Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc., 734 F.Supp. 1071, 1078 (S.D.N.Y.1990).

---

**4.** The members of the Probationer–Parolee class also originally asserted a statutory claim. In their statutory argument, plaintiffs contend that the Act does not authorize the Division of Parole or the Department of Probation to determine risk classifications and that therefore such determinations may be made only by a court. Plaintiffs' argument is rejected, for § 168–g (1) specifically provides that those two agencies "in accordance with risk factors pursuant to [§ 168–l (5)] shall determine the duration of registration and notification for every sex offender who on the effective date of this [Act] is then on parole or probation for [a covered] offense." Although the language is not as clear as it could be, the most reasonable interpretation is that these two agencies were charged with the responsibility of applying the risk factors to classify parolees and probationers to determine the level of notification. See People v. Stevens, 91 N.Y.2d 270, 669 N.Y.S.2d 962, 963, 692 N.E.2d 985, 986 (1998) ("For the fixed number of sex offenders convicted before the effective date of the Act, but who achieved parole or probation status by the effective date, the Division of Parole or Probation makes the risk determination."). Plaintiffs' illogical construction of "notification" to mean notification only of a change in address is rejected.

■ Defendants oppose the granting of leave to amend on three grounds: the due process claims are not conducive to a class action; delay; and prejudice. These arguments are unpersuasive.

First, although there are variations in the claims of the individual members of the Proposed Additional class, there are also many similarities, as set forth more fully below. I conclude that the due process claims of these individuals can be addressed on a class-wide basis.

Second, although this case was filed more than two years ago, at that point only the members of the Probationer–Parolee class had received risk level classifications. The individuals comprising the Proposed Additional class did not begin receiving risk level classifications until after the suit was filed. The information concerning the risk level classifications of the Proposed Additional class members and the extent of their alleged due process deprivations did not become available until after August of 1996. I ruled on the *ex post facto* claims and dismissed, without prejudice, the due process claims in September 1996. Plaintiffs thus had only a two-month window within which to amend the complaint, and during that time, the parties were diligently briefing the cross-motions for summary judgment. Hence, I find that plaintiffs' failure to seek leave to amend the complaint sooner was excusable.

Third, defendants will not be unduly prejudiced by an amendment of the complaint at this time. The issues in this case are "primarily legal in nature, requiring little discovery." *United States v. Continental Illinois Nat'l Bank & Trust Co.,* 889 F.2d 1248, 1255 (2d Cir.1989). Thus, neither party will suffer the added burden and expense of extensive supplemental discovery. Moreover, I note that defendants have been on notice that the claims of the Proposed Additional class members could be added, for my original summary judgment opinion covered all persons who committed their crimes before January 21, 1996, including individuals who were incarcerated on that date. Accordingly, defendants' arguments in this respect are rejected.

The motion for leave to amend the complaint is granted. Plaintiffs are hereby granted leave to amend the complaint to add the claims of those who have been judicially classified and to add the three proposed representative plaintiffs as named plaintiffs in this action.

### b. *The Motion for a Preliminary Injunction*

Next, I consider the Proposed Additional class members' motion for a preliminary injunction. The individuals who were still incarcerated on the date the Act went into effect have since been or will be assigned risk level classifications by a court pursuant to § 168–$n$ of the Act. They maintain, however, that the risk level classification hearings that have been conducted thus far are replete with procedural deficiencies, and the cumulative effect of such deficiencies is depriving convicted sex offenders of their constitutionally guaranteed right to procedural due process on a class-wide basis. They move for a preliminary injunction enjoining defendants from going forward with community notification of their risk levels "until they have been afforded the essential elements of procedural due process under the Fourteenth Amendment in the determination of their risk levels." (Pltfs. Mem. Supp. Prelim. Inj. at 2).

■ A party seeking a preliminary injunction usually must show (i) that it is likely to suffer irreparable harm if temporary injunctive relief is not granted and (ii) either (A) a likelihood of success on the merits or (B) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of the hardships tipping decidedly in its favor. *Polymer Tech. Corp. v. Mimran,* 37 F.3d 74, 77–78 (2d Cir.1994). Where the moving party "seeks to stay government[al] action taken in the public interest pursuant to a statutory or regulatory scheme," however, that party must satisfy the likelihood of success prong of the second part of the test. *Able v. United States,* 44 F.3d 128, 131 (2d Cir.1995) (quoting *Plaza Health Labs., Inc. v. Perales,* 878 F.2d 577, 580 (2d Cir.1989)). Accordingly, in this case, the members of the Proposed Additional class must show irreparable harm and a likelihood of success on the merits.

### (1) *Irreparable Harm*

■ The members of the Proposed Additional class will suffer irreparable harm if immediate injunctive relief is not granted. In my prior decision granting a preliminary injunction enjoining defendants from implementing the public notification provisions of the Act against the members of the Probationer–Parolee class on *ex post facto* grounds, I held that these individuals had shown that they were likely to suffer irreparable harm. *See Doe v. Pataki*, 919 F.Supp. at 698. The Second Circuit did not disturb that holding.

My earlier reasoning applies with equal force here. The members of the Proposed Additional class will likely suffer the same or similar harm if public notification occurs based on erroneous risk level classifications. Accordingly, I find that the members of the Proposed Additional class have satisfied their burden of showing irreparable harm.

### (2) *Likelihood of Success on the Merits*

The members of the Proposed Additional class essentially challenge the entire system by which convicted sex offenders are judicially assigned risk levels under § 168–*n* of the Act. They contend that convicted sex offenders who have been judicially classified are, on a class-wide basis, being deprived of the minimal requirements of due process set forth above, such as the right to proper notice of the proceeding, including notice sufficiently in advance to afford the offender an opportunity to prepare; the right to the assistance of counsel at the proceeding; pre-hearing disclosure of the evidence upon which the Board's recommendation is based; clear and convincing evidence as the governing standard of proof; and the right to appeal. Because the Act provides for some of these procedural protections but is silent on others, their due process claim encompasses challenges to both the Act on its face and as applied.

Defendants do not disagree that the minimal requirements of notice and a meaningful opportunity to be heard are required in sex offender classification proceedings to satisfy due process. Rather, they dispute that the minimal requirements of due process includes all the components demanded by plaintiffs. Additionally, they argue that the basic elements of due process—notice and an opportunity to be heard—are provided for by the Act, and that convicted sex offenders are being afforded these rights by courts in actual hearings.

Because I have already outlined above the procedural safeguards that are required to satisfy the due process rights of sex offenders in risk level classification hearings, and because I have been provided with evidence from both sides indicating that convicted sex offenders in New York are not being furnished with these safeguards, I conclude that the members of the Proposed Additional class have also demonstrated a likelihood of success on the merits.

The stories of Poe, Coe, and Loe demonstrate why safeguards are necessary to protect the due process rights of convicted sex offenders in risk level classification hearings. The transcript of Poe's hearing indicates that the court undertook no independent review of the Board's risk level recommendation. Moreover, Poe was not represented by counsel at his hearing, nor was he ever provided with a copy of the risk assessment instrument or the case summary. The court simply advised Poe that he had been assessed 120 points, and when Poe inquired what that meant, the judge stated that it meant he was assigned risk level three, without elaborating on any of the factors relied upon to so classify him. Furthermore, when Poe attempted to bring out mitigating factors, the court apparently ignored him.

The circumstances surrounding Coe's classification hearing are perhaps even more troubling. Coe was summoned to appear at his classification hearing, but the notice did not apprise him of the Board's recommendation or the ramifications of a level two or three classification. Moreover, Coe was not assigned counsel to represent him at the hearing, even though he had been found indigent and had been assigned counsel in his underlying criminal proceeding, and had been identified as borderline mentally retarded. Like Poe, Coe was never provided with a copy of his risk assessment instrument, case summary, or risk level recommendation,

all of which the court relied on to assign him at risk level two. Most significantly, however, the Board apparently incorrectly described Coe's underlying offense in the case summary. Hence, Coe was assigned risk level two by the court on the basis of the wrong criminal charge, despite Coe's protestations that the classification was based on an erroneous description of the crime. Finally, when Coe filed a notice of appeal, the First Department dismissed the appeal *sua sponte,* stating that no avenue existed to appeal a judicial determination of a sex offender's risk assessment under the Act. The Court of Appeals likewise refused to permit an appeal.

Loe's classification hearing was scheduled for a Monday afternoon, but Loe was not notified of the hearing until the Friday before, and thus was unable to retrieve his case file on such short notice. The Legal Aid attorney assigned to represent him at the hearing was unfamiliar with Loe's case, and had no opportunity to review Loe's file prior to arriving at court for his hearing. Although she was provided with Loe's risk assessment instrument and case summary prepared by the Board at the hearing, when she requested a brief adjournment of the hearing to allow her time to prepare, the court granted her a one-day continuance. When Loe's classification hearing reconvened the following day, Loe's attorney identified several factors in the risk assessment instrument that she believed were not supported by any evidence and asked the court to sign a subpoena to obtain the file relied upon by the Board in making its risk level recommendation. The court refused, and summarily affirmed the Board's recommendation of risk level three without taking any testimony and relying solely on the documents submitted by the Board. When Loe's attorney attempted to file a notice of appeal, the clerk of the court refused to accept it, stating that the Appellate Division had instructed all clerks not to accept notices of appeal in sex offender cases.

Viewing these facts in light of the requirements of procedural due process outlined above, it is clear that Poe, Coe, and Loe were denied the fundamental elements of proce-dural due process at their risk level classification hearings.

Defendants have attempted to demonstrate that for every offender whose due process rights were violated at his risk level classification hearing, there are others whose hearings have comported with the requirements of procedural due process. For instance, the Assistant Attorney General representing defendants in this action stated in her declaration that she has "participated in numerous risk assessment proceedings on behalf of the Board," and that in all her cases "offenders were given notice, were represented by counsel and were afforded an opportunity to be heard prior to a judicial determination of their risks levels." (Morrison Decl. ¶¶ 8, 16). She cites at least a half-dozen cases where the sex offender was afforded some combination of an opportunity to challenge the Board's recommended risk level, the right to counsel, discovery of the materials upon which the Board's recommendation was based, the right to submit documents and testify on his own behalf, and the right to have the factors used against him be proved by the state by a standard of clear and convincing evidence. (*See id.* ¶¶ 9–14). What is lacking among these examples, however, is a case in which the offender was afforded all the necessary elements of due process.

I have no doubt that many sex offenders will receive fair hearings before many state court judges. *See, e.g., People v. Salaam,* 174 Misc.2d 726, 666 N.Y.S.2d 881 (Sup.Ct. N.Y. County 1997). The point is, however, that the amount of due process afforded an individual sex offender should not turn on the particular practices of a court with respect to notice or the degree of care displayed by an individual judge. In addition, errors undoubtedly will be made, and even the Attorney General's Office seems to acknowledge that there must be some avenue for appeal. Yet the First Department has held otherwise and the Court of Appeals has held that there is no right to a criminal appeal. *People v. Stevens,* 91 N.Y.2d 270, 669 N.Y.S.2d 962, 963, 692 N.E.2d 985, 986 (1998).

Defendants acknowledge that the Act fails to provide explicitly for direct appeal of a

risk assessment determination, but they contend that convicted sex offenders have alternative means through which to seek review of their risk level classifications. Risk level determinations, they argue, are appealable under CPLR § 5701 or in an Article 78 proceeding. The First Department, however, has held otherwise, concluding that no appeal lies at all. 240 A.D.2d 351, 660 N.Y.S.2d 714. In fact, plaintiffs present evidence that the First Department has refused, since its decision, even to accept notices of appeal from convicted sex offenders challenging their risk level determinations. (*See* Ginsburg Decl. ¶ 6).

The Act's failure to provide explicitly for an avenue for appeal of risk level determinations is the one alleged procedural deficiency common to all members of · the Proposed Additional class. This deficiency alone would satisfy the likelihood of success on the merits test because the absence of a review provision effectively forecloses the possibility of any meaningful review of any constitutional claims convicted sex offenders may have with respect to their risk level determinations, a prospect that offends the very notion of fundamental fairness embodied in the concept of procedural due process.

■■■ Nor are defendants correct in asserting that an avenue for appeal exists through Article 78 of the CPLR. Article 78 provides that "a proceeding under this article shall not be used to challenge a determination which was made in a civil action or criminal matter." N.Y. Civ. Prac. ·L. & R. § 7801 (McKinney 1994). Hence, Article 78 provides for judicial review of *administrative* action, and does not generally permit review of judicial action, except in certain narrow circumstances. Those narrow circumstances, however, only include an action for mandamus to compel a court's performance or nonperformance of a ministerial or clerical act, see *Green v. Ingrassia*, 665 N.Y.S.2d 577, 577 (2d Dep't 1997), or a prohibition action to restrain a judicial officer from acting without jurisdiction or in excess of jurisdiction. *See Town of Huntington v. New York State Div. of Human Rights*, 82 N.Y.2d 783, 604 N.Y.S.2d 541, 542–43, 624 N.E.2d 678 (Ct. App.1993). Neither circumstance would cov-

er a convicted sex offender's appeal of his risk level determination. Thus, no means appear to exist by which an offender can raise constitutional challenges to his risk level determination under New York State law. The lack of any provision for review of risk level determinations effectively denies convicted sex offenders the opportunity to fully and fairly litigate their claims of due process violations at their risk level classification hearings.

In addition to the lack of an avenue for appeal, the Act fails to provide procedures to ensure due process. The Act is silent on the question of the burden of proof. Although the Attorney General's Office concedes that the state must bear the burden of proving the appropriateness of a risk level by clear and convincing evidence, the examples of Poe and Coe show that, in the absence of clear guidance in the Act, courts are placing the burden on the convicted sex offender to prove the Board's recommendation is wrong. Moreover, that task is made impossible by the Act's failure to provide for pre-hearing discovery and reasonable notice, as the individuals are forced to prove that the Board was wrong without being apprised of the Board's reasoning or the evidence on which the Board relied.

For all these reasons, I conclude that the members of the Proposed Additional class have demonstrated a likelihood of success on the merits.

**c. *The Rooker–Feldman Doctrine***

Finally, defendants argue that this Court lacks subject matter jurisdiction over the proposed new claims under the doctrine articulated by the Supreme Court in *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923), and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983).

■■■ Under the *Rooker–Feldman* doctrine, the lower federal courts lack jurisdiction to review state court judgments. *See Rooker*, 263 U.S. at 416, 44 S.Ct. 149; *Feldman*, 460 U.S. at 482, 103 S.Ct. 1303. Only the United States Supreme Court is granted

appellate jurisdiction to review final judgments of the highest courts of the respective states. *See* 28 U.S.C. § 1257(a). Therefore, by negative implication, the lower federal courts have no power to review state court judgments. *See Tang v. Appellate Div. of the New York Supreme Court, First Dep't,* 487 F.2d 138, 141–43 (2d Cir.1973), *cert. denied,* 416 U.S. 906, 94 S.Ct. 1611, 40 L.Ed.2d 111 (1974); *see also Atlantic Coast Line R.R. Co. v. Brotherhood of Locomotive Eng'rs,* 398 U.S. 281, 296, 90 S.Ct. 1739, 26 L.Ed.2d 234 (1970).

 The *Rooker–Feldman* doctrine operates similarly to principles of collateral estoppel, *see Moccio v. New York State Office of Court Admin.,* 95 F.3d 195, 199 (2d Cir.1996), but is intended to prevent a federal district court from "entertain[ing] a proceeding to reverse or modify [a state court] judgment for errors" and thus improperly exercising "appellate jurisdiction" where the district court's jurisdiction is "strictly original." *Rooker,* 263 U.S. at 416, 44 S.Ct. 149. Thus, the doctrine will not deprive a federal district court of jurisdiction unless the plaintiff's claims involve direct review of a state court decision or are "inextricably intertwined" with the state court's determination. *See Feldman,* 460 U.S. at 482–84 n. 16, 103 S.Ct. 1303.

 Here, plaintiffs do not ask me to sit in direct review of any state court decision. Rather, I am being asked to consider class-wide claims, problems created not by a particular state court's application of the Act but by the Act's failure to provide due process protection. Hence, the *Rooker–Feldman* doctrine will deprive me of jurisdiction only if the constitutional claims raised here are "inextricably intertwined" with the state courts' determinations of sex offenders' risk levels. As noted by the Second Circuit, "the Supreme Court has provided . . . little guidance in determining which claims are 'inextricably intertwined' with a prior state court judgment and which are not." *Moccio,* 95 F.3d at 198. At a minimum, however, the claims raised in federal court must at least have been presented in the state court proceeding for the doctrine to apply. *See id.* at 198–99. "[W]here the claims were never

presented in the state court proceedings and [where] the plaintiff did not have an opportunity to present the claims in those proceedings, the claims are not 'inextricably intertwined' and therefore not barred by *Rooker–Feldman.*" *Id.* at 199 (citing *Texaco Inc. v. Pennzoil Co.,* 784 F.2d 1133, 1144–45 (2d Cir.1986), *rev'd on other grounds,* 481 U.S. 1, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987)).

In light of these standards, I conclude that the *Rooker–Feldman* doctrine does not apply here. I acknowledge that I have been presented with information relating to classification hearings for only a small number of convicted sex offenders. None of these individuals, however, raised constitutional claims at their hearings. Nor have the parties cited any state court cases in which the due process issues were raised.

It is apparent that plaintiffs did not have a full and fair opportunity to present their due process claims in the state court proceedings. Unlike the plaintiff in *Moccio,* who at least could have raised his federal constitutional claims in his Article 78 proceeding, *see Moccio,* 95 F.3d at 199, it is highly doubtful that members of the Proposed Additional class ever had, or ever will have, such an opportunity to raise their due process claims in the state courts. Indeed, the First Department's holding in Coe's case aptly illustrates the dilemma faced by convicted sex offenders in New York. Dismissing the sex offender's appeal *sua sponte,* the court held that "[n]o avenue exists to appeal a judicial determination of a sex offender's risk assessment under [the Act]." 240 A.D.2d 351, 660 N.Y.S.2d 714. Likewise, Article 78 relief is not available to challenge a judicial—as opposed to administrative—determination. *See supra* at 477. Clearly, a meaningful opportunity to raise constitutional claims pertaining to application of the Act to individual sex offenders is not available in the New York State courts. Accordingly, I hold that the *Rooker–Feldman* doctrine does not bar me from adjudicating the merits of plaintiffs' claims in this Court.

## CONCLUSION

With respect to the members of the Probationer–Parolee class, plaintiffs' motion for

summary judgment is granted and defendants' cross-motion for summary judgment is denied. Defendants, their agents, employees, and all persons acting in concert with them are hereby permanently enjoined from classifying members of the Probationer–Parolee class at higher than risk level one unless and until they are reclassified by a court in accordance with procedures that satisfy the requirements of due process as set forth above.

With respect to the members of the Proposed Additional class, plaintiffs' motion for leave to amend the complaint and their motion for a preliminary injunction are also granted. Defendants, their agents, employees, and all persons acting in concert with them are hereby preliminarily enjoined, pending final resolution of this action, from classifying members of the Proposed Additional class at higher than risk level one unless and until they are reclassified by a court in accordance with procedures that satisfy the requirements of due process as set forth above.

With respect to the remaining claims, that is, the claims of the Proposed Additional class, any and all discovery is to be completed by July 19, 1998. Cross-motions for summary judgment are to be filed, simultaneously, no later than August 21, 1998, with opposition papers to be filed, simultaneously, no later than September 18, 1998. If the parties decide they do not need discovery, the briefing schedule will be accelerated.

SO ORDERED.