■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v IAN KEARNS, Appellant. [677 NYS2d 497] —Appeal by the defendant from a judgment of the Supreme Court, Kings County (George, J.), rendered July 18, 1996, convicting him of sexual abuse in the first degree, upon his plea of guilty, and imposing sentence.

Ordered that the judgment is affirmed.

The defendant's sentence was not excessive, as the sentence imposed was the one agreed upon during plea negotiations (*see, People v Kazepis,* 101 AD2d 816).

We note that the sentencing court's assessment of the defendant as a "sexually violent predator" under the Sex Offender Registration Act (Correction Law § 168-*l* [6] [c]; § 168-d [3]) is not reviewable (*see, People v Stevens,* 235 AD2d 440, *affd* 91 NY2d 270; *Matter of Raphael S. v Leventhal,* 246 AD2d 659; *People v Rodriguez,* 240 AD2d 351). O'Brien, J. P., Thompson and Goldstein, JJ., concur.

Friedmann, J., concurs and votes to affirm the judgment appealed from with the following memorandum: Although I am obliged by State law to concur with the majority's decision to affirm, I write separately to address the limited issue of the apparent unreviewability of a convicted sex offender's "risk level determination" under the Sex Offender Registration Act (Correction Law Art 6-C) (hereinafter SORA or the Act), or New York's version of New Jersey's so-called Megan's Law.

While not minimizing in any way the crimes of which these offenders have been found guilty, I consider it troubling that the legal system has to date failed to identify how, if at all, and by whom, if by anyone, their classifications may be reviewed. Indeed, in the most authoritative ruling on the subject to date, *People v Stevens* (91 NY2d 270), the Court of Appeals has declared that a SORA classification is not "a traditional, technical or integral part of a sentence that somehow relates back to or becomes incorporated into the * * * judgment of conviction" (*People v Stevens, supra,* at 276). New York's highest court has accordingly concluded that because neither the Correction Law nor the Criminal Procedure Law expressly provides for review of a defendant's reoffender risk level determination, there is no right of direct appeal from these assessments (*People v Stevens, supra,* at 278).

However, the *Stevens* court expressly left open the possibility that some other form of review might be feasible, such as in a proceeding pursuant to CPLR article 78 (*see, People v Stevens, supra,* at 279; *see also, People v Cash,* 242 AD2d 976). According to *Stevens,* then, until the Legislature acts, or until the Court of Appeals is persuaded that a SORA classification should be "subject to typical or special judicial review as a civil or criminal proceeding that may generate some discrete, authorized appellate review" (*People v Stevens, supra,* at 279), offenders like the one before us have no recourse from an inappropriate reoffender classification.

*I. Why There Should Be Some System of Review of SORA Classifications*

The instant case is a good example of why *some* system of review must be afforded these offenders, whether it be created by the judiciary or by the Legislature, if serious miscarriages of justice and misapplications of the SORA legislation are to be obviated.

As a threshold matter, I reject the recent suggestion by the United States Court of Appeals for the Second Circuit, in the context of a "retroactive application" or "ex post facto" analysis, that the Act's notification provisions are not "punishment" (*Doe v Pataki,* 120 F3d 1263, 1276-1277, *cert denied* 522 US

1122) simply because their *primary* purpose is "regulatory" (Mem of Senate in Support, Bill Jacket L 1995, ch 192, at 6). Among other things, a defendant who has received a "level three" (most serious) classification is publicly labeled a "sexually violent predator." The offender's name, address, and photograph may thereafter be disseminated throughout the community accompanied by warnings of the person's dangerous proclivities (*see,* Correction Law § 168-*l* [6] [c]; § 168-q). Such an individual must register with the Division of Criminal Justice Services once a year for at least 10 years, and possibly for life, and must personally submit verification of residence every 90 days (*see,* Correction Law § 168-h; Mem of Senate in Support, Bill Jacket L 1995 ch 192, at 5; Mem of Attorney-General, Bill Jacket L 1995, ch 192, at 35-36), or risk misdemeanor or even felony adjudication (*see,* Correction Law § 168-t). The Legislature recognized the gravity of these impositions on the life of a released offender by providing, *inter alia,* that the releasee has a right before being classified to appear and be heard, and to be represented by counsel (*see,* Correction Law § 168-n [3]). As is noted in, *inter alia,* the Budget Report included in the Bill Jacket to the Act, once identified, these offenders "may never be accepted within the community" again; they will assuredly have a difficult if not impossible time "begin[ning] anew"; and they are likely to become the targets of community "vigilantism" (Ten-Day Bill Budget Report on Bills, Bill Jacket L 1995, ch 192, at 21).

Not only would it be unconscionable to subject an individual not deserving of level three categorization to a lifetime of public branding and surveillance without any possibility of review, but it would unreasonably burden Criminal Justice officials to require them to maintain maximum scrutiny of *all* convicted sex offenders, when statistics indicate that only about 5% of them actually qualify as "high risk" public menaces (*see, e.g., E.B. v Verniero,* 119 F3d 1077, 1088, *cert denied sub nom. W.P. v Verniero,* 522 US 1109).

*II. The Risk Assessment Guidelines And Commentary*

As the Risk Assessment Guidelines and Commentary (*see,* Board of Sex Examiners, Sex Offender Registration Act: Risk Assessment Guidelines and Commentary [Jan. 1996], hereinafter the Guidelines) makes clear, the Act was passed to protect society from the threat posed by a sex offender who is about to be released into the community. The magnitude of the threat depends upon two considerations: the defendant's likelihood of reoffense, and the harm that would be inflicted if that defendant *did* reoffend (*see,* Risk Assessment Guidelines and Commentary, Commentary, *op. cit.,* at 2).

The Guidelines are emphatic that the court that is given the job of classifying a defendant (usually his original sentencing court) should make an individualized determination in nearly every instance. Per se imposition of a level three classification is recommended only when one of four specified "overriding factors" is present: the defendant has a prior sex felony conviction or adjudication, the defendant has caused serious injury or death to his victim, the defendant has recently threatened to reoffend, or the defendant has been diagnosed as suffering from a chronic inability to control impulsive sexual behavior (Risk Assessment Guidelines and Commentary, Commentary, *op. cit.*, at 3-4). In the absence of one or more of these "overrides," the court should not succumb to the temptation to find, for example, that just because an offender has been convicted of a crime as heinous as first-degree rape, said offender must automatically be designated a level three offender (Risk Assessment Guidelines and Commentary, Commentary, *op. cit.*, at 2-3; *op. cit.*, at 3, n 3).

The risk assessment instrument is divided into four parts: current offense, criminal history, post-offense behavior, and release environment (Risk Assessment Guidelines and Commentary, Commentary, *op. cit.*, at 1-3). Each part is divided into factors (there are 15 factors in all); and the factors are subdivided into crime characteristics, to which "points" are ascribed in ascending order of severity. Thus, Factor 1 under "Current Offense" is labeled "Use of Violence," which in turn is composed of three alternative characteristics, as follows: "1. The offender used forcible compulsion (10 points); 2. The offender inflicted physical injury (15 points); 3. The offender was armed with a dangerous instrument (30 points)" (Risk Assessment Guidelines and Commentary, Commentary, *op. cit.*, at 1). According to the Guidelines, "[p]oints should not be assessed for a factor—e.g. the use of a dangerous instrument—unless there is *clear and convincing evidence* of the existence of that factor" (Risk Assessment Guidelines and Commentary, Commentary, *op. cit.*, at 5 [emphasis supplied]), derived, for example, from the offender's own admissions, the victim's statements, and/or Probation Department evaluations (*see, e.g., People v Salaam*, 174 Misc 2d 726). "The fact that an offender was arrested or indicted for an offense is not, by itself, evidence that the offense occurred" (Risk Assessment Guidelines and Commentary, Commentary, *op. cit.*, at 5). For definitions of terms used by the Guidelines, the reader is referred to the Penal Law. Thus, for example, for the court to assign a defendant 15 points for causing "physical injury" to a victim, there must be "clear and convincing evidence" (Risk Assessment

Guidelines and Commentary, Commentary, *op. cit.,* at 5) that the victim suffered an "impairment of physical condition or substantial pain" (Penal Law § 10.00 [9]).

A defendant's risk category is dictated by the number of points scored. Thus, a total score of 70 points or less results in a classification as a level one sex offender, subject to minimal registration and notification requirements; a score of between 70 and 110 requires intermediate, level two staging, including notification of "vulnerable" populations of the defendant's presence among them; and 110 points or more results in a classification as a level three sexually-violent predator, subject to stringent registration requirements and widespread publicization of the person's identity, potentially for life (Correction Law § 168-a [1], [2]; § 168-d [1]; § 168-n; Mem of Attorney-General, Bill Jacket L 1995, ch 192, at 36-37, 39).

The Board of Examiners of Sex Offenders is commissioned to review each offender's record and make a recommendation to the court when the offender is released from incarceration, before the risk assessment ranking takes place (*see,* Correction Law § 168-n). A court may reject these recommendations "only for arbitrariness and capriciousness" (*People v Ross,* 169 Misc 2d 308, 312).

*III. This case*

In this case, according to the Probation Department Report, at a little after midnight on August 19, 1995, the defendant, a 26-year old single male, with no criminal record, no history of any psychiatric disorder, and no background of drug or other substance abuse, was "hanging out" on a stoop in Brooklyn with Jorge Moreno and Moreno's 16-year old girlfriend. Some voluntary sexual horseplay apparently occurred between Moreno and his girlfriend, in which the defendant was invited to participate by Moreno. Matters got out of control, however, and the girl subsequently reported to the "Youth Line" that she had been raped and sexually abused by the two men. The defendant was arrested five months later when the complainant's sister saw him riding his bicycle in the neighborhood and called 911.

Although the indictment charged the defendant with two counts of rape and seven counts of sexual abuse, the defendant pleaded guilty to one count of sexual abuse in the first degree, for touching the complainant's vagina with his hand by means of forcible compulsion. Following his plea of guilty on May 21, 1996, the defendant, who had spent four months in jail, was released on his own recognizance pending sentencing in July. On July 18, 1996, the court sentenced the defendant, as promised, to six months incarceration and five years probation.

At the same time, the court reviewed the various SORA factors without benefit of a Board recommendation (*see,* Correction Law § 168-d). In addition, neither the victim nor her parents had responded to the Probation Department's request that they submit a "Victim Impact Statement," so that the information at the court's disposal in making its SORA determinations was limited. Finally, the prosecutor presented no evidence at the hearing, did not oppose defense counsel's arguments for lower point assignments, and made no recommendations of his own.

According to the court's tally, the defendant scored 115 points, including the following: Fifteen points for "violence," because the Probation Report noted that the complainant had suffered "bruises on her knees as a result of this incident", as well as because the indictment had charged the defendant, *inter alia,* with putting his finger in the victim's anus. The court announced that it was "not going to permit this defendant to have a lower level under the Sexual Offender Registration Law, a lower level of risk because he was permitted to enter a plea of guilty to [a] less serious offense [than] he was charged with".

Continuing the latter reasoning in its consideration of Factor 2—"sexual contact with the victim"—the court refused to assign points consistent with the crime to which the defendant had pleaded guilty ("contact with the victim under clothing [10 points]"), instead hiking the point count to 25 because the indictment had initially charged him with rape.

The Guidelines provide that 20 points may be assessed against a defendant whose sex crime was "directed at a stranger or a person with whom a relationship had been established or promoted for the primary purpose of victimization" (*op. cit.,* at 11). The defendant at bar told the Probation Officer that he had known Moreno from the neighborhood, but that he had been unacquainted with the complainant prior to the offense. However, the Probation Report stated that "according to the District Attorney's file the defendant has known the complainant for ten years". Certainly the complainant's *sister* knew the defendant, because although she had not been a witness to the crime, she was able to identify the perpetrator when he rode by on his bicycle. In either event, the defendant is not the type of obsessive stalker of children on the street at whom this provision of the Act was targeted. Nevertheless, the court assigned the defendant 20 points for sexually abusing an underaged "stranger".

The Guidelines further prescribe an attribution of 15 points

to a sex offender who has a "history" of "substance abuse", on the ground that such offenders often use drugs and/or alcohol as disinhibitors preparatory to committing their crimes (*op. cit.,* at 14). The court at bar assigned the defendant 15 points because of a notation in the Probation Department Report that since his adolescence the defendant had smoked marihuana approximately once a week—although within the previous year he had discontinued all marihuana use. In addition, the defendant admitted to drinking unspecified amounts of beer, initially sporadically, but more recently "on a daily basis". Such equivocal admissions do not, in my opinion, constitute "clear and convincing evidence" of a "history" of "substance abuse".

Although the defendant pleaded guilty and admitted during his allocution (as well as to the police following his arrest) that he had been involved in the instant crime, the court charged him with 10 points for failing to accept responsibility for his behavior. However, according to the Commentary to the Guildelines explaining Factor 12, an offender deserves 10 points when, for example, he tells his presentence investigator that he did not commit the crime, and that he is only pleading guilty to escape a state prison sentence.

Finally, under Factor 15, "Living or Employment Situation," the court assessed 10 points against the defendant because, at age 26, he did not have a steady job and was living with his disabled mother. The court was unimpressed with counsel's representation that the defendant was currently earning $8 an hour at various construction jobs, contributed from this income to his mother's household expenses, and planned to earn his bachelor's degree, having already completed two years at Brooklyn College. However deplorable the defendant's lack of steady employment and continued dependence on his mother, his domestic circumstances were not "inappropriate" as that adjective is defined by the Guidelines. Rather, an "inappropriate" work or living environment deserving a 10-point assessment is one that gives the offender access to new victims and/or a reduced probability of detection, as when he moves into a building adjoining an elementary school playground or takes a job as a school bus driver (*see,* Risk Assessment Guidelines and Commentary, Commentary, *op. cit.,* at 16).

*IV. Conclusion*

The defendant at bar has been misclassified as a level three risk of reoffending, when a proper tallying of the Act's factors could result in a score of well below 70 points, which would place him in level one. Indeed, any objective assessment of the circumstances of the defendant's crime leads to the conclusion

that he poses a comparatively low risk of reoffense, and that the potential harm to the community, even if he were to reoffend, is relatively minor. His level three ranking is also inconsistent with the imposition of a sentence of probation. Indeed, the court seems to have seized upon the SORA scheme as an opportunity to impose an additional punishment, on top of the probationary penalty that the defendant had bargained for.

The instant apparent misapplication of the Act's Guidelines cannot be corrected because our legal system has either neglected or refused to provide any mechanism for review of the sex offender classification process. In my opinion, this is an oversight which should be addressed as soon as possible by the Legislature. In the interim, I believe that it is the function of the judiciary to fill in, if only provisionally, such an "interstice of criminal appellate review" (*People v Stevens, supra,* at 279) where, as here, the absence of any avenue for remedial consideration permits a distortion of the legislative intention and offends our system of justice.